11 A.3d 830

**In re JEREMY P.**

**No. 1820 Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Jan. 19, 2011.

2

David P. Kennedy (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: MEREDITH, KEHOE, ARRIE W. DAVIS, (Retired, Specially Assigned), JJ.

DAVIS, J.

The Circuit Court for Prince George's County, sitting as a juvenile court, found that Jeremy P., appellant, was "involved" in carrying a handgun, possessing a regulated firearm and ammunition under the age of twenty-one, and obliterating the identification number of that firearm.[1] Appellant challenges that judgment, arguing that the juvenile court erred in denying his motion to suppress physical evidence and a statement to police, because the evidence was obtained as the result of an unconstitutional *Terry*[2] stop. We agree and therefore reverse the judgment.

## FACTS AND LEGAL PROCEEDINGS

Appellant moved to suppress a handgun, ammunition, and written statement recovered after a *Terry* stop that occurred in the early morning hours of June 6, 2009. Detective William Lee of the Prince George's County Police Department, an eight-year veteran assigned to the Prince George's County Gang Unit, testified that, at approximately 1:00 a.m., he was on plainclothes patrol in an unmarked vehicle in the 6100 block of 58th Avenue in Riverdale. They were "doing a saturation of the area due to recent gang taggings in the area and armed

---

1. Disposition immediately followed the adjudicatory hearing. The juvenile court ordered appellant to take a drug test and, upon learning that result was negative, ordered an indefinite period of supervised probation and required appellant to participate in the Take Charge program and to successfully complete an educational program leading to a GED.

2. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

robberies in the area." A "tagging is when a gang or a crew places their name on a fence or wall or sign. It could be the ground, a car, to tell other gangs or other people in the area that that's their area." Detective Lee had recently made gang-related arrests in that block and that area, including arrests for assaults and robberies.

The detective spotted appellant, who was then seventeen years old, and a companion as they exited a McDonald's parking lot on foot. Detective Lee proceeded to park his vehicle on 58th Avenue and watched them from across the road, at a "fairly close" distance. When the prosecutor asked the detective to describe what happened next, the following ensued:

[Prosecutor]: As you were moving your vehicle—from the time you were moving your vehicle to the time you stopped your vehicle, did you maintain sight of the [appellant]?

[Det. Lee]: Yes, I did.

Q: And what if anything did you notice the [appellant] doing?

A: *He kept playing around with his waistband area. We call that a high risk area. And he kept making firm movements in his waistband area.*

Q: Can you—

Permission to have the witness stand up?

The Court: Sure.

[Prosecutor]: Can you just come out and stand right here and show the Court exactly what actions you witnessed the [appellant] making?

(Witness leaves the stand.)

[Det. Lee]: *He would have been adjusting hisself. He had a shirt on. He would have been adjusting hisself from the front area, you know, fixing (indiscernible) the shirt.*

The Court: All right.

(Witness returns to the stand.)

[Prosecutor]: What if anything appeared (indiscernible)?

[Defense Counsel]: Objection, Your Honor.

The Court: What was the question again?

[Prosecutor]: What if any significance (indiscernible)?

[Defense Counsel]: The significance would call for some type of legal conclusion. He can testify as to his observations, but significance is up to the Court regarding the legal conclusions to be drawn from the evidence.

The Court: I'll make the legal conclusion, but I'm going to let him answer the question. The objection's overruled. Go ahead.

[Det. Lee]: *It would be indicative of somebody constantly carrying a weapon on them. That's what we call the high risk area....*

Q: And the actions you witnessed the Respondent making, how frequent were they?

A: *He was standing there for maybe—just maybe a minute or two. He did it maybe two or three times before they crossed the street.*

Q: But there was a time that he crossed—did he cross the street?

A: Yes, ma'am.

Q: What if anything did he do after he crossed the street?

A: Started walking down 50th Avenue. I actually backed off a little bit. I was trying to get my partner to respond over to me so we could do a stop together. I didn't want to get him—I didn't know where he was heading, so I wanted to get him to stop. I had to do another stop prior to my partner getting there....

Q: What if anything did you do after you saw the [appellant] making the motions toward his waistband?....

A: Like I said, I just called for my partner to respond to the area because I knew we were going to do a stop.

Q: And ... who did you call?

A: Detective Sorano.

Q: Okay. And after you called for Detective Sorano, what if anything did you then do next?

A: I watched him a little bit further until he started to cross the street, and then I backed off a little bit further down 58th.... I got out of my vehicle and waited for him and his partner to get a little bit closer before I did the stop.

Q: What if anything did you do after you got out of your vehicle?

A: Then I approached him and his friend, his partners, and told them to have a seat on the ground. And again I was waiting for my partner to come, but I decided to go ahead and start patting them down just in case there was a gun on him..... I identified myself, Prince George's County Police. I'm familiar with Mr. [P.], but I'm not familiar with his friends....

Q: You were familiar with Mr. [P.]. Have you had prior contact with Mr. [P.]?

A: Yes, ma'am.... Just I think the first one would have been—I think he was arrested by the Sheriff's Department at a high school for coming on the school property....

Q: What if any prior contact have you specifically had with Mr. [P.]?

A: Just a few stop—you know, stop and talk, and then we make conversation with him in the street. We were looking for a friend of his where we engaged in conversation with him before we arrested another friend of his....

Q: Why'd you start conducting a pat-down? ...

A: Again with him making the movements to the waist-band and fiddling around once I stopped him, I figured I better get him to stand up and start doing the pat-down for my safety....

Q: How exactly did you conduct the pat-down?

A: It really didn't get that far. Once I—he had recently sat down once I did the stop. Once I told him he needed to stand up and come over to my car, when he stood up, the gun was actually—he was sitting on top of the gun. I guess it had fell out of the waistband area....

Q: Once you saw the gun, what if anything did you then do?

A: I handcuffed him, then I continued the pat-down and recovered some bullets in his pants pocket.

(Emphasis added.)

Appellant was taken to the police station, where he waived his right to counsel, talked to Detective Lee and made a written statement about where he got the weapon. The weapon was "[a]n 8 caliber revolver" with its serial number covered by "tape that's on the grip[.]" Test-firing established that the gun was operable. The ammunition was "three ball rounds[.]"

On cross-examination, Detective Lee testified that appellant acknowledged his possession of the weapon and "told him [t]hat he had gotten it from an uncle." Lee admitted that, although he had previously stopped appellant "several times" and "patted him down on other occasions," no weapon had been recovered and appellant had never been arrested for possessing a weapon.

When defense counsel then indicated that he intended to call appellant as a witness, the juvenile court continued the adjudicatory hearing until the following week. When the case was called on that date, however, appellant did not testify.

Instead, in support of appellant's motion to suppress, defense counsel argued that Detective Lee's testimony about "furtive movements in the waistband area" in "a high crime area" was insufficient to establish a reasonable suspicion that criminal activity was afoot. Counsel asserted that the same behavior "also can be construed as someone pulling up their pants" and pointed out that Detective Lee admitted that his prior searches of appellant had not yielded a weapon. Citing *Ransome v. State*, 373 Md. 99, 816 A.2d 901 (2003), counsel argued that, "if we're going to permit the stop that happened here, . . . it basically is saying that you can't walk down the street and pull up your pants."

The prosecutor countered that Detective Lee was "looking at" appellant's behavior "through the lens of a law enforcement officer who's familiar with how weapons are carried," who had prior contacts with appellant, who had made arrests in that high crime area, and who was on patrol that night "to see if anything [was] happening." According to the State, "as a result of [Lee's] prior training and experience ... as to how the weapons that are unholstered are carried," he reasonably believed "that the motions he saw were characteristic of a gun being carried in an unholstered manner."

Agreeing with the State, the juvenile court denied appellant's motion to suppress and explained its ruling as follows:

> The police are called to an area of the county where they reported the gang tagging graffiti sprayed on public areas. There were a number of assaults, a number of robberies, and the police department decided to deploy extra personnel in the area. While in the area, Detective William Lee, ID Number 2629, observed the Respondent in this case exiting the McDonalds' in the area. *He notices him playing with his waistband. He further states he made furtive movements, furtive movements in the sense of the case law that suggested it was indicative of him wearing a weapon.* Eventually he was stopped. He was asked to take a seat. A partner was called to assist Detective Lee, at which point he notices the gun in the waistband. I think for those reasons, the motion to suppress should be denied, and it is.

(Emphasis added.)

## DISCUSSION

■ Appellant renews his argument that Detective Lee's testimony did not establish the reasonable suspicion necessary to justify a *Terry* stop. As the Court of Appeals has explained, the landmark *Terry* decision

> recognized that a law enforcement officer may conduct a brief investigative "stop" of an individual if the officer has a reasonable suspicion that criminal activity is afoot. Although such encounters with law enforcement are indeed

seizures as contemplated by the Fourth Amendment, the [Supreme] Court reasoned that the limited nature of a brief investigative stop does not demand a standard as stringent as probable cause. Accordingly, pursuant to *Terry* and its progeny, "a police officer who has reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion."

*Crosby v. State,* 408 Md. 490, 505–06, 970 A.2d 894 (2009) (citations omitted).

 Our task in reviewing the denial of a motion to suppress evidence alleged to have been recovered as the result of a constitutionally unjustified *Terry* stop is to

view the evidence adduced at the suppression hearing, and the inferences fairly deductible therefrom, in the light most favorable to the party that prevailed on the motion. In so doing, "[w]e extend great deference to the fact finding of the suppression court and accept the facts as found by that court unless clearly erroneous." Nevertheless, in resolving the ultimate question of whether the detention and attendant search of an individual's person or property violates the Fourth Amendment, we "make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." Our review ordinarily is limited to the record of the suppression hearing.

*Id.* at 504–05, 970 A.2d 894 (citations omitted).

Appellant argues that *Ransome v. State,* 373 Md. 99, 816 A.2d 901 (2003), is the "Maryland case most closely on point[.]" In that case, a patrol officer suspected a large bulge in Ransome's pocket might be a weapon. At the suppression hearing, Officer Moro testified

that the area was a high-crime one, which is why he and his fellow officers were assigned to patrol it. He also recounted that petitioner stopped and looked at the car as it approached, and that, as Moro questioned petitioner, he ceased making eye contact and "his voice was getting real

nervous." At one point, he stated that his decision to conduct the frisk was "based upon what I'm seeing with the bulge in his pocket and the way the defendant's mannerism, the way he's talking to me." . . . In response to questions from the court, Officer Moro stated that his decision to stop and frisk petitioner was based solely on his observation of the bulge in petitioner's pocket and his immediate conclusion from that bulge that petitioner may be armed.

*Id.* at 105–06, 816 A.2d 901.

The Court of Appeals held that the unexplained bulge in Ransome's pocket did not establish a reasonable suspicion that he was involved in criminal activity. *See id.* at 107–08, 816 A.2d 901. The Court "accept[ed] . . . that a noticeable bulge in a man's waist area may well reasonably indicate that the man is armed," that typically "men do not stuff bulky objects into the waist areas of their trousers and then walk, stand, or drive around in that condition," and that "those who go armed do often carry handguns in that fashion." *Id.* at 107, 816 A.2d 901. Nevertheless, the Court pointed out that, "as most men do not carry purses, they, of necessity, carry innocent personal objects in their pants pockets—wallets, money clips, keys, change, credit cards, cell phones, cigarettes, and the like— objects that, given the immutable law of physics that matter occupies space, will create some sort of bulge." *Id.* at 107–08, 816 A.2d 901. For that reason, the mere presence of "any large bulge in any man's pocket" does not justify a *Terry* stop. *See id.* at 108, 816 A.2d 901. A contrary conclusion, the Court reasoned, "would allow the police to stop and frisk virtually every man they encounter." *Id.*

Although the Court recognized that "[t]here have been . . . many cases in which a bulge in a man's clothing, along with other circumstances, has justified" a *Terry* stop and frisk, *id.*, in Ransome's case, there was nothing about his appearance or behavior that reasonably could be considered as indication that he was involved in criminal activity. *See id.* at 109–10, 816 A.2d 901. The officer's claim that he considered Ransome's nervous behavior to be suspicious was not supported by any "articulable" facts as to why he believed Ransome might

be involved in criminal activity. *See id.* at 109–10, 816 A.2d 901. In particular, the Court pointed out that the officer

> *never explained why he thought that [Ransome's] stopping to look at his unmarked car as it slowed down was suspicious or why petitioner's later nervousness or loss of eye contact, as two police officers accosted him on the street, was suspicious. As noted, Terry requires the officer to point to "specific and articulable facts" justifying his conduct. Unlike the defendants in the cited cases, or indeed in Terry, petitioner had done nothing to attract police attention other than being on the street with a bulge in his pocket at the same time Officer Moro drove by.* He had not committed any obvious offense, he was not lurking behind a residence or found on a day care center porch late at night, was not without identification, was not a known criminal or in company with one, was not reaching for the bulge in his pocket or engaging in any other threatening conduct, did not take evasive action or attempt to flee, and the officer was not alone to face him.

*Id.* (emphasis added).

In these circumstances, the Court concluded that the State had failed to satisfy its burden of establishing a factual basis for the stop.

The command that we generally respect the inferences and conclusions drawn by experienced police officers does not require that we abandon our responsibility to make the ultimate determination of whether the police have acted in a lawful manner or that we "rubber stamp" conduct simply because the officer believed he had a right to engage in it. We understand that conduct that would seem innocent to an average layperson may properly be regarded as suspicious by a trained or experienced officer, but *if the officer seeks to justify a Fourth Amendment intrusion based on that conduct, the officer ordinarily must offer some explanation of why he or she regarded the conduct as suspicious; otherwise, there is no ability to review the officer's action.*

We are fully cognizant of dangers constantly lurking on our streets and of the plight of conscientious police officers who have to make split-second decisions in balancing their duties, on the one hand, to detect and prevent crime and assure their own safety while, on the other, respecting the dignity and Constitutional rights of persons they confront. The conduct here, on the record before us, crossed the line. *If the police can stop and frisk any man found on the street at night in a high-crime area merely because he has a bulge in his pocket, stops to look at an unmarked car containing three un-uniformed men, and then, when those men alight suddenly from the car and approach the citizen, acts nervously, there would, indeed, be little Fourth Amendment protection left for those men who live in or have occasion to visit high-crime areas.* We hold that Officer Moro did not have a reasonable basis for frisking petitioner and that the evidence recovered by him as a result of the frisk and subsequent extended search was inadmissible.

*Id.* at 110–11, 816 A.2d 901 (emphasis added and citations omitted).

This case differs from *Ransome* in that Detective Lee's suspicion that appellant was carrying a weapon stemmed from his observation of appellant's behavior in making adjustments at his waistband, not from the presence of a bulge in appellant's pocket. Conceding this obvious factual distinction, appellant nevertheless argues that, just as the bulge in Ransome's pocket, plus his nervous demeanor while standing on a sidewalk in a high crime area on a summer night, did not raise a reasonable suspicion that criminal activity was afoot, neither did appellant's handling of his shirt at his waistband, while standing on a street in a high crime area on a summer night, establish an objectively reasonable basis for this *Terry* stop.

We agree with the State that, generally "a bulge and hand movements around the waistband are not equivalent factors in a reasonable suspicion analysis." *See, e.g., Singleton v. United States,* 998 A.2d 295, 302–03 (D.C.2010) (although a bulge in the defendant's pocket did not give rise to reasonable suspicion "without further elaboration," where defendant also en-

gaged in an "awkward walk and hand movement that seemed to be protective of a firearm secreted in the pocket" and repeatedly looked back nervously at the officer as he walked away from him, reasonable suspicion existed).[3] Yet it is clear that, just as a bulge may be created by a wide variety of objects other than a weapon, so, too, can a person touching the area of his waistband be indicative of a wide variety of causes other than adjusting a concealed weapon. And both the State and appellant recognize that there is no Maryland precedent involving a stop premised solely on the type of waistband adjustments at issue in this case. *Cf., e.g., Bost v. State,* 406 Md. 341, 359, 958 A.2d 356 (2008) (defendant's "clutching at his waistband" during unprovoked flight from police established reasonable suspicion); *In re David S.,* 367 Md. 523, 539, 789 A.2d 607 (2002) (reasonable suspicion was established by evidence that defendant was observed in the commission of a possible burglary, placing a dark object that looked like a gun into his waistband); *Smith v. State,* 106 Md.App. 665, 666 A.2d 883 (1995) (affirming reasonable suspicion finding where police were called to the area for weapons discharging and encountered defendant, who immediately withdrew and tucked an object into his waistband), *aff'd on other grounds,* 345 Md. 460, 693 A.2d 749 (1997).

---

**3.** As the State concedes, the reasonable suspicion finding in *Singleton* reflected that the officer

testified that he was "familiar with the sizes and shapes [of firearms]" and how a firearm "would look underneath clothing." Officer Abate also said that appellant was "walking in a rigid manner" and testified that he knew, based on personal experience with firearms, how someone walking with a firearm in his pocket "consciously" places his hand on the pocket "to potentially maybe brace it so something does not get in the trigger guard," that could cause the weapon to fire, injuring the person. According to Officer Abate, that is how appellant was walking. Officer Abate also testified that appellant had made motions with his hand toward the pocket with the bulge. Moreover, Officer Abate observed that appellant appeared to be "extremely nervous," looked over his shoulder at the officer approximately five times "within ten paces of exiting the building," attempted to "quickly walk [ ] away," and continued to look back at Officer Abate as if "to see what [his] actions were."

*Singleton v. United States,* 998 A.2d 295, 301 (D.C.2010).

Appellant cites a number of "waistband" cases decided in other jurisdictions and our research uncovered others. Although there can be no bright-line rule given the individualized nature of such cases, our review indicates that a police officer's observation of a suspect making an adjustment in the vicinity of his waistband does not give rise to reasonable suspicion sufficient to justify a *Terry* stop. Typically, to provide the reasonable and articulable suspicion necessary to warrant an investigative detention in the absence of other suspicious behavior indicating the possibility of criminal activity, the officer must be able to recount specific facts, in addition to the waistband adjustment, that suggest the suspect is concealing a weapon in that location, such as a distinctive bulge consistent in appearance with the presence of a gun. *Cf., e.g., Illinois v. Fox,* 203 Ill.App.3d 742, 148 Ill.Dec. 826, 561 N.E.2d 132, 134–35 (1990) (no reasonable suspicion where patrol officer observed motorcyclist make an adjustment at an area of his waistband where there was a bulge); *Louisiana v. Williams,* 621 So.2d 199, 201 (La.Ct.App.1003) (no reasonable suspicion where officers merely saw defendant "fooling with his belt area" but "there was 'no telling' what he was doing and 'it could have been several things' "); *New York v. Stevenson,* 7 A.D.3d 820, 779 N.Y.S.2d 498, 499 (2004) (no reasonable suspicion where officer observed "a bulge in the center of defendant's waistband" and saw him "adjust his clothing around the bulge several times" because "the detective did not indicate that the bulge had the outline of a weapon, and he was unable to describe it in further detail"); *New York v. Powell,* 246 A.D.2d 366, 667 N.Y.S.2d 725, 727–28 (1998) (no reasonable suspicion based on observations that defendant made "an adjustment to the right side of his waistband" and walked with his left arm swinging freely and the right "held stiffly against his body," even where officers first initiated a field inquiry eliciting nervous responses because "no officer testified that he observed the outline of a gun, a waistband bulge or any other telltale sign of weapon"); *New York v. Moor,* 176 A.D.2d 297, 574 N.Y.S.2d 400, 401 (1991) (no reasonable suspicion based on bulge on right side of defen-

dant's waistband and defendant "plac[ing] his right hand on his waistband '[m]aking like an adjustment' ").

The key to linking any potentially suspicious factor—whether it be a bulge or a waistband adjustment—to the possibility of criminal activity by a suspect lies in the hands of the officer who made the *Terry* stop. Mere conclusory statements by the officer that what he saw made him believe the defendant had a weapon are not enough to satisfy the State's burden of articulating reasonable suspicion that the suspect was involved in criminal activity. *See Ransome,* 373 Md. at 110–11, 816 A.2d 901. For that reason, the officer's account of the stop must include specific *facts* from which the court can make a meaningful evaluation of whether the officer's suspicion was objectively reasonable under the totality of the circumstances. As our colleagues in the District of Columbia recently explained,

> even though not a demanding standard, to be "reasonable" the suspicion must be based on facts that would have led another officer to have a similar suspicion. Moreover, to be "articulable," there must be specific evidence—not merely conclusions—that led the officer to suspect criminal activity in a particular circumstance. These two requirements are not only the minimal safeguard of a person's constitutionally protected freedom to go about without coercion or seizure, but also are necessary for meaningful judicial evaluation of police action. We, therefore, look closely at the evidence presented and the trial court's assessment of that evidence, understanding that each case must be evaluated on its own merits, and that "case matching" is of limited utility under a totality of the circumstances analysis.

*Singleton,* 998 A.2d at 300–01 (citation omitted).

Two cases arising from *Terry* stops in New York provide an instructive comparison illustrating the importance of articulating facts in addition to the waistband adjustment. In *United States v. Padilla,* 548 F.3d 179 (2d Cir.2008), cited by appellant for the proposition that New York courts "have held that similar observations are insufficient to warrant a *Terry*

stop[,]" a police detective covertly observed a man who appeared to be a vulnerable drug user as he was followed in a suspicious manner by Padilla and another man. The detective initially suspected that a robbery might occur, but when that did not happen, he began to suspect a drug deal. One factor that contributed to the officer's suspicion was that Padilla made movements in the area of his waistband.

As we shall explain below, the Second Circuit's discussion of this evidence, including the in-court demonstration by the stopping officer, is instructive in the case *sub judice:*

> *Det. O'Brien observed Padilla reach underneath his jacket and shirt and adjust a weighty object concealed at the center of his waistline. From his police experience-which included eight to ten arrests of armed individuals observed to make the same movement, and the regular sight of his fellow officers adjusting concealed firearms carried by them in the same fashion,* Det. O'Brien recognized Padilla's gesture as consistent with the adjustment of a concealed firearm. Viewing the gesture "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," it was reasonable to infer that Padilla was carrying a gun in his waistband.
>
> Padilla maintains that the gesture was ambiguous because the dimensions of the adjusted object could not be seen through his clothing. However, *after watching two in-court demonstrations of the gesture, the magistrate judge concluded that it was "a distinctive gripping motion, as if holding and adjusting (first up and then down) something comparable in size, shape, and heft to a handgun."* Padilla also contends that he could have been adjusting an innocuous item, such as a cell phone, a key ring or a belt buckle. Yet *Det. O'Brien testified that the adjustment was not consistent with any of the innocent explanations proposed by defense counsel at the suppression hearing, and the magistrate credited this testimony.* Even if the gesture were consistent with conceivable innocuous adjustments, its "distinctive" consistency with the adjustment of a firearm

provided the detective with a reasonable basis to suspect that Padilla was armed.

*Id.* at 189 (emphasis added and citations omitted).

Although appellant acknowledges that the *Terry* stop was valid in *Padilla*, he maintains that the presence of a host of other suspicious facts warranted the finding of reasonable suspicion in that case. We agree that *Padilla* is factually distinguishable based on these other factors.[4] Nevertheless, the federal court's analysis of the evidence regarding Padilla's adjustment at his waistband illustrates that such adjustments may reasonably be construed as indicating the presence of a weapon tucked into the defendant's waistband when the detective's testimony and in-court demonstration of those movements contains enough factual detail to explain why the presence of a gun was suspected.

*New York v. Marine*, 142 A.D.2d 368, 536 N.Y.S.2d 425 (N.Y.App.Div.1989), provides a contrasting example of a case in which the prosecution failed to present sufficient factual detail to justify a stop arising from a comparable waistband adjustment. As in this instance, a patrol officer initiated a stop because he saw Marine make an adjustment at his waistband as he was walking down the street in a high crime area. The New York appellate court held that

Officer Zanchelli's observations of defendant and the attendant circumstances did not warrant a reasonable suspicion by the officer that defendant was engaged in criminal activity. Defendant's conduct, prior to the forcible stop, which Zanchelli effected by "[nosing]" the front of his patrol car over the sidewalk "to block [defendant] off", was innocuous.

---

4. The Second Circuit ultimately held in *Padilla*, 548 F.3d at 189:

The totality of the circumstances in this case—the high-crime neighborhood, the sight of two men surreptitiously following a man whose appearance suggested drug use down an otherwise-deserted street, the choice of a dark path not commonly used at night, the apparent adjustment of a concealed firearm—provided ample basis for an investigative stop. Indeed, given the distinct possibility that an armed robbery might be about to occur, the officers would have been derelict in their duty had they failed to take action.

*Defendant was simply walking along the sidewalk at 8:30 p.m., allegedly somewhat inebriated, but not causing any disturbance or making any threatening or furtive gestures, when Zanchelli observed defendant "fix an object" under his jacket. Although Zanchelli testified that he suspected that the object was a gun, this was mere speculation on his part, for all the officer could see was defendant reaching into his jacket with his right hand. Zanchelli could just as well have assumed that defendant was scratching his stomach or tucking in his shirt. Indeed, at that point, Zanchelli did not discern any waistband bulge or observe the outline or any part of a gun, and he had received no report that a man with a gun was in the vicinity. In the absence of such additional information to arouse a reasonable suspicion, the inference that defendant was carrying a weapon rather than a host of innocent objects was unwarranted.....*

Under the circumstances, Zanchelli was authorized, at best, to exercise his common-law right of inquiry. To justify the more significant intrusion that ensued, however, Zanchelli was bound to articulate facts sufficient to establish a reasonable suspicion that defendant was committing a crime. This he failed to do, for all of the described events leading up to the search of defendant's person were susceptible of innocent interpretation.... Zanchelli testified that he did not pursue defendant in order to investigate what he possessed, but rather, "to ask him where he was going and what he was doing." Only after the officer accomplished this objective did he notice a "suspicious bulge". Based on his hunch that the bulge was a gun, he reached out and touched it. A police response subjectively premised upon a "hunch" or "gut reaction", however, is an insufficient predicate upon which to found a search and seizure.

Furthermore, ... this court recently reaffirmed the well-settled rule that a pat down or frisk conducted in the course of an authorized investigatory stop may not be predicated merely on the observation of an undefinable bulge in a jacket. Rather, there must be "proof of a describable object or of describable conduct that provides a reasonable

basis for the police officer's belief that the defendant [has] a gun in his possession". *Here, there was no proof of a describable object that reasonably could have been suspected of being a gun. Zanchelli neither saw the outline of a gun, nor any part of what appeared to be a gun. Significantly, he was completely unable to describe the bulge.*

Therefore, Zanchelli's conduct in placing his hand on the bulge must "be justified by some describable conduct of defendant which reasonably [led the officer] to conclude that the bulge was evidence of a gun." Aside from the fact that defendant appeared to be intoxicated, however, his behavior was, in all other respects, unremarkable. Indeed, his conduct belied any consciousness of guilt, for he was well aware of the officer's presence and yet made no effort to avoid walking directly in Zanchelli's path or to run away as he made the innocuous "adjustments" Zanchelli described.

Finally, we emphasize that the reputation of a location, however notorious, does not provide a predicate for subversion of the Fourth Amendment. Of course, in determining whether the police acted reasonably in a given case a court may consider "the nature and location of the area where a suspect is detained". That factor, however, must "exist in combination with objective factors specific to the incident which together support a founded suspicion that some particular criminal activity may be afoot." Here, defendant's observed conduct and the attendant circumstances failed to support a founded suspicion that defendant was engaged in criminal activity. Therefore, in the context of this case, we find the location of the arrest to be without significance.

A consideration of the facts in their totality leads us to conclude that the police action taken was far too intrusive under the circumstances.

*Id.* at 370–72, 536 N.Y.S.2d 425 (citations omitted).

*Padilla* and *Marine* instructively identify the type of specific factual detail necessary to establish reasonable suspicion in a "waistband case" such as this. The key to linking any potentially suspicious factor—whether it be a bulge or a

waistband adjustment—to the possibility of criminal activity by a suspect lies in the hands of the officer who made the *Terry* stop. Conclusory statements by the officer that what he saw made him think the defendant had a weapon do not satisfy the State's burden of articulating reasonable suspicion that the suspect was involved in criminal activity. *See Ransome*, 373 Md. at 110–11, 816 A.2d 901. The outcomes in both *Padilla* and *Marine* demonstrate that an officer's account of the stop must include specific *facts* from which the court can make a meaningful evaluation of whether the officer's suspicion was reasonable under the totality of the circumstances.

In this case, Detective Lee's reasons for stopping appellant lacked the specific factual information elicited by the *Padilla* prosecution. Rather, as in *Marine*, Detective Lee provided no descriptive details about the specific movements he observed and failed to articulate why he considered appellant's movements to be indicative of a concealed weapon. Detective Lee simply testified that he saw appellant adjust something underneath his shirt in the "high risk area" at his waistband with "firm movements" and demonstrated those adjustments for the juvenile court. After viewing that demonstration, the court gave a "shorthand" characterization of appellant's movements as "furtive . . . in the sense of the case law that . . . was indicative of him wearing a weapon."

Apart from these waistband adjustments, the detective did not indicate that either appellant or his companion were behaving in an suspicious manner. Nor did Detective Lee correlate this "high risk area" of the body to appellant's specific behavior that night. Significantly, the detective did not testify that he observed a bulge consistent with the presence of a weapon. Nor did he explain why he interpreted such conduct to indicate the presence of a weapon, rather than merely a cell phone or another innocent object.[5] He did not

---

5. In its brief, the State asserts, without citation to the record, that a cell phone would not "account for repeated 'firm movements' and 'adjustments' around the waistband." But, notably, that factual detail was not provided by Detective Lee.

state that appellant appeared to be moving an object under his shirt, much less ascribe an apparent weight or size that might have indicated a gun. In further contrast to *Padilla*, Detective Lee did not testify about his own experience in recovering a gun based on observations of similar waistband adjustments. Moreover, despite his training and experience in gang-related crime, he offered no information tying gang affiliation to weapons concealed at the waistband or appellant to a gang.

The State argues that any deficiency in Detective Lee's testimony was effectively cured by his in-court demonstration of what he observed. To be sure, as in *Padilla*, such a physical depiction of appellant's movements was critical in persuading the lower court to deny the motion to suppress. Although we must defer to a suppression court's opportunity to observe witnesses, resolve conflicts in the evidence and determine what weight to give the evidence, we must nevertheless make our own independent constitutional appraisal of whether reasonable suspicion exists by applying the law to those facts. *See Crosby*, 408 Md. at 504–05, 970 A.2d 894. And we must do so based solely on the suppression record presented to us on appeal. *See id.* at 505, 970 A.2d 894.

In this instance, we cannot conclude, based on Detective Lee's in-court demonstration, that there was reasonable suspicion warranting this stop. As in *Padilla*, the detective's demonstration satisfied the lower court that appellant's movements were consistent with handling an unholstered gun. In contrast to *Padilla*, however, this demonstration was not accompanied by a factually descriptive narrative; instead, Detective Lee merely testified that appellant adjusted himself "from the front area" and "fix[ed] ... his shirt." Neither did the juvenile court supply the type of specific summary that aided the appellate court's review in *Padilla;* instead, the court simply stated in conclusory fashion that appellant's movements, as portrayed by Detective Lee, were "furtive ... in the sense of the case law[.]"

The question, then, is whether appellant is "stuck" with the juvenile court's effectively unreviewable finding that, as dem-

onstrated by Detective Lee, appellant's waistband adjustments warranted this detention. *Terry* stop case law establishes that the answer must be "no," because the State bears the burden of articulating a sufficient factual basis for the stop, and appellate courts cannot fill in blanks in the evidentiary record. *See, e.g., Crosby,* 408 Md. at 508–09, 970 A.2d 894 (The stopping officer " 'must be able to explain those inferences and deductions so as to show that there was 'a particularized and objective basis' for the stop.' ") (citation omitted). As the Court of Appeals has emphasized, we may not " 'rubber stamp' conduct simply because the officer believed he had the right to engage in it." *Ransome,* 373 Md. at 111, 816 A.2d 901.

For the reasons set forth above, we conclude that Detective Lee did not articulate an adequate factual basis for this stop in either his testimony or his in-court demonstration. Consequently, we hold that the juvenile court erred in denying appellant's motion to suppress the evidence and statement obtained following the stop. We shall reverse the judgment and remand for further proceedings, including a new trial if the State has a sufficient evidentiary basis for such proceedings.

**JUDGMENT REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**