*Tamere Thornton v. State of Maryland*, No. 1569, September Term 2016. Opinion by Arthur, J.

**FOURTH AMENDMENT – ATTENUATION DOCTRINE**

Even where evidence would not have been discovered but for a Fourth Amendment violation, that evidence should not be excluded if the chain of causation leading to the discovery of the evidence has been interrupted by an "intervening circumstance" that sufficiently attenuates the connection between the violation and the discovery of the evidence. A person's flight in response to unlawful police conduct may constitute an "intervening circumstance" if the flight constitutes a new and distinct crime.

In this case, the defendant ran away from an allegedly unlawful pat-down during an otherwise lawful traffic stop. By doing so, the defendant appeared to commit the crime of "fleeing and eluding" the officers in violation of section 21-9004(b)(2) of the Transportation Article. This apparent commission of a new crime justified a second, lawful seizure, which produced the evidence that the defendant sought to suppress. Under these specific facts, the defendant's flight qualified as an intervening circumstance for the purpose of the attenuation doctrine.

The presence of this intervening circumstance, along with the absence of any flagrant or purposeful misconduct by the officers, outweighed the close temporal proximity between the pat-down and the discovery of the evidence. Overall, the connection between the pat-down and the evidence was sufficiently attenuated that the evidence should not be excluded as the product of an unlawful pat-down.

**FOURTH AMENDMENT – REQUIREMENT OF SEARCH OR SEIZURE**

Driver seated in parked car was seized within the meaning of the Fourth Amendment where police officers made several assertions of authority to detain the driver for a parking violation and where the driver temporarily submitted to those assertions of authority.

Police officer initiated a search within the meaning of the Fourth Amendment by touching the driver's waistband for the purpose of frisking him for weapons, notwithstanding that the driver fled on foot before the frisk was completed.

After the driver tried to run away during the pat-down but fell down, the driver was seized once again when officers physically restrained him and moved him from the ground.

## MOTION TO SUPPRESS – STANDARD OF REVIEW

Generally, the appellate court views the trial court's findings, the evidence, and the inferences drawn therefrom in the light most favorable to the party that prevails on an issue that a defendant raises in a motion to suppress evidence. The State is not entitled to these favorable inferences where the defendant raises an issue on which the State bears the burden of persuasion, where the State fails to persuade the trial court that it has met its burden, and where the trial court denies the motion to suppress on other grounds.

In this case, the trial court expressed doubt about whether a pat-down was supported by reasonable suspicion but went on to conclude that the evidence should not be excluded even if the officers lacked reasonable suspicion. Under those circumstances, it is inappropriate to view the record in the light most favorable to the State in conducting appellate review of the issue of reasonable suspicion.

Circuit Court for Baltimore City
Case No. 116027021

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1569

September Term, 2016

_____

TAMERE THORNTON

v.

STATE OF MARYLAND

_____

Nazarian,
Arthur,
Friedman,

JJ.
_____

Opinion by Arthur, J.
_____

Filed: July 25, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

Tamere Hassan Thornton[1] was charged in the Circuit Court for Baltimore City with offenses related to the possession of a handgun. After the circuit court denied his motion to suppress evidence, Thornton entered a plea of not guilty and allowed the case to proceed on an agreed statement of facts. On that basis, he was convicted of one count of possessing a regulated firearm after previously being convicted of a crime of violence. The court sentenced him to four years of imprisonment and permitted him to remain on bail during this appeal to challenge the suppression ruling.

For the reasons discussed in this opinion, we conclude that the circuit court did not err when it determined that the evidence of handgun possession was too attenuated from any unreasonable search to require the exclusion of that evidence. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The basic facts are as follows: police officers detained Thornton for a parking infraction across the street from his home; after asking Thornton a few questions, the officers ordered him to step out of his car so that they could perform a pat-down search; as soon as the officer started to pat down Thornton's clothing, Thornton tried to run away, but he fell after a short distance; and the officers quickly restrained him and lifted him off the ground to discover a handgun underneath him.

The officers placed Thornton under arrest and transported him to a police station. They did not issue a parking citation. The weapon that they recovered was a .32 caliber

---

[1] Some documents in the record use the name "Thorton" rather than "Thornton."

semi-automatic handgun with a 2-1/8 inch barrel.  It had one live round in the chamber and a magazine with five live rounds.  Testing showed that it was operable.

Thornton was charged with five counts: (1) possessing a handgun after being convicted of a crime of violence; (2) possessing a handgun after being convicted of a disqualifying crime; (3) wearing, carrying, or transporting a handgun on or about his person; (4) wearing, carrying, or transporting a handgun in a vehicle travelling on a public road; and (5) possessing ammunition after having been prohibited from possessing a regulated firearm.  He was released after posting bond.

Counsel for Thornton filed an omnibus motion, which included a request to suppress evidence obtained at the time of his arrest.  The circuit court held a suppression hearing on August 29, 2016.

Only two witnesses testified: Baltimore City police officers Kenneth Scott and Jeremy Zimmerman.  As the circuit court recognized, the two officers gave "somewhat conflicting stories" about some events leading to the discovery of the handgun.  The court described Officer Scott's testimony as "unconvincing" in many respects, and it appeared to rely on some of Officer Zimmerman's testimony.  To provide context for analyzing the court's ruling, this summary includes testimony from both officers.

At around 2:00 p.m. on January 11, 2016, three officers assigned to an "Operations Drug Unit" were travelling in an unmarked police vehicle on Midwood Avenue.  According to Officer Scott, who was a passenger in that vehicle, they were "patrolling" and "driving through to go through McCabe for CDS," or controlled dangerous substances.  He asserted that "McCabe" is "a high drug area, traffic [sic]"

2

located "right off of Midwood."[2]  In the words of Officer Zimmerman, the driver of the vehicle, they were in the area looking for "[d]rugs, weapons, all kinds of things[.]"

At the same time, Tamere Thornton was sitting in the driver's seat of a Cadillac sedan parked across from his home on Midwood Avenue.  The sedan's lights were off, and its engine was not running.  On the same block, a tree-removal crew was occupying multiple parking spaces with two trucks and a set of cones.  The sedan was parked nearby, facing against the flow of traffic, with its left wheels next to the curb.  Maryland law requires that a vehicle parked on a two-way roadway must be "parked parallel to the right hand curb or edge of the roadway, with its right hand wheels within 12 inches of that curb or edge of the roadway."  Md. Code (1977, 2012 Repl. Vol.), § 21-1004(a) of the Transportation Article ("TA").

Officer Scott noticed that the sedan was improperly parked on the wrong side of Midwood Avenue.  Officer Zimmerman made a U-turn and stopped the unmarked police vehicle directly behind the sedan.  The officers activated the emergency lights of the police vehicle, but did not activate its siren.  Officer Zimmerman walked to the driver's side of the sedan, Officer Scott walked to the passenger side, and a third officer remained inside the police vehicle.  The officers were wearing tactical vests with the word "POLICE" displayed in bold letters across their chests.

Thornton remained in the driver's seat of the sedan as the two officers approached.

---

[2] It is unclear whether Officer Scott was referring to McCabe Avenue, a street that intersects with Midwood Avenue, or to Woodbourne-McCabe, a neighborhood in northern Baltimore.

For a brief period of time, less than one minute, the officers proceeded to ask Thornton a few questions. Although Officer Scott claimed that the initial purpose of the encounter was to inform the driver that the sedan was "on the wrong side of the street," no testimony indicates that the officers actually told Thornton about the parking violation. According to both officers, Thornton's demeanor was "laid back," and he did not say anything unusual during the exchange. Nevertheless, both officers testified that, because of certain hand movements that Thornton made, they suspected that he might be carrying a weapon. As the circuit court noted, Officer Scott testified in "fairly vague terms" about these hand movements, while Officer Zimmerman's testimony "was less vague" on that matter.

Officer Scott, a 10-year veteran of the police department, asserted that he had training and experience in identifying armed persons. Throughout his testimony, Officer Scott frequently stated his conclusion that Thornton displayed "characteristics of an armed individual" while seated in the sedan. The only applicable "characteristic[]" that Officer Scott mentioned is that an armed person sometimes will perform "checks" by touching his or her "front waistband area," which, Officer Scott said, is a common place for a person to carry a firearm.

Officer Scott testified that he could see Thornton "looking out his mirror" as the officers approached the sedan. Officer Scott claimed that, as he approached the passenger side of the sedan, he saw Thornton "numerous times like start making movements to his front area[.]" According to Officer Scott, Thornton kept his hands "down on the side" and "around his waistband area." When asked about any hand

4

movements that he may have observed, Officer Scott gave various responses:

> [OFFICER SCOTT]:  Like [Thornton] just kept like doing a check, like just trying to, I don't know, like push it down or just (indicating), I don't know, you know, just to make sure it's secured.  I'm not sure what he was trying to do but, I mean, it just . . .

> \* \* \*

> [OFFICER SCOTT]:  He was still like, the same thing, like a weapons check, just trying to, you know, like he had something he was trying to hide.

> \* \* \*

> [OFFICER SCOTT]:  It was more or less like his – yeah, I mean like, yeah, like I said, just trying to – I don't know if he was trying to push it down so like I guess we wouldn't be able to see it or I'm not sure, but I just know he just kept doing it . . .

> \* \* \*

> [OFFICER SCOTT]:  But I mean, you know, it was just – something just didn't fit right with him keep checking his waist area.

Officer Scott testified that he did not speak to Thornton at first, but instead focused on observing Thornton's conduct while Officer Zimmerman questioned Thornton from the opposite side.  At one point, Officer Scott heard Thornton say that he "lived across the street."[3]

Officer Scott asked Thornton if he would permit the officers to search the sedan. Thornton declined, which he certainly had the right to do.  *See Longshore v. State*, 399

---

[3] Officer Scott believed that Officer Zimmerman "probably talked to [Thornton] and got his license from him," with which he would have been able to verify that Thornton lived across the street.  Officer Zimmerman said that he could not recall whether they obtained Thornton's license before or after the eventual arrest.  The circuit court ultimately concluded that the evidence did not support a finding that the officers asked for identification or received it until after the arrest.

Md. 486, 537-38 (2007) (explaining that a "person has a constitutional right to refuse to consent to a warrantless search of his or her automobile, and such refusal may not later be used to implicate guilt[,]" nor can it be used to justify a warrantless search).

In response, Officer Scott told Thornton that they would need to wait for a "K-9 unit" to arrive with an odor-detecting dog. In his testimony, however, Officer Scott admitted that he did not actually intend to call for a K-9 unit. Officer Zimmerman later explained in his testimony that officers sometimes tell a detained driver that they intend to call a K-9 unit only "to gauge the reaction" of the driver. The circuit court described this tactic as "a bluff." There is no indication that Officer Scott's "bluff" provoked any particular reaction from Thornton.

Officer Scott testified that, after announcing an intention to call for a K-9 unit, he told Officer Zimmerman to "pull [Thornton] out of the vehicle" for a weapons check. During cross-examination, Officer Scott was unable to explain why he would have first asked permission to conduct a vehicle search and then suggested that he would call a K-9 unit if he had truly believed all along that Thornton was carrying a weapon. Officer Scott could only say that "the hair on the back of [his] neck . . . stood up after a minute," which made him "think [Thornton] ha[d] something."

As the circuit court noted, Officer Zimmerman described in "greater detail," relative to his partner, the "specific motions" that Thornton allegedly made. Citing his training and experience from three years with the Baltimore City police, Officer Zimmerman asserted that common indications that a person may be armed include "a bladed stance away from" an officer, "security checks," "favoring one side of [the]

6

body," and, in particular, "holding the area where the weapon is concealed." He asserted that, when trying to determine whether the occupant of a vehicle may be armed, one should "look for a shoulder moving up or down drastically" as a result of the effort "to reach under a seat or to . . . further conceal something in [the person's] front waistband."

Officer Zimmerman testified that, as he walked to the driver's side of the sedan, he "observed Mr. Thornton raise his right shoulder and kind of bring his elbows together," which Officer Zimmerman characterized as "consistent with attempting to conceal something in the front area of [a person's] body." Officer Zimmerman performed a demonstration of this movement as he described it a second time: "right shoulder up which kind of brings your hand up a little bit higher and then . . . elbows together, kind of pushing down."[4]

In Officer Zimmerman's opinion, "it was very apparent that [Thornton] was uncomfortable with whatever was in his lap," because he continued "making adjustments" around "where [his] belt buckle would be on [his] pants." Officer Zimmerman said that, although Thornton was not "grabbing anything," it appeared that he was "manipulating something" and that he "was obviously uncomfortable" with the "the position," or "the size," or "the shape" of whatever object he was manipulating. Officer Zimmerman testified that Thornton "would sit back down and attempt to adjust something in his waistband" whenever he "would lean over to the right to address"

_____

[4] Although Officer Zimmerman said that Thornton raised his shoulder, the court later described it in these words: "dropping of the shoulder, elbows in, [and] reaching to the waistband area."

Officer Scott. This happened "about two or three times," according to Officer Zimmerman.

In total, Officer Zimmerman estimated that Thornton made four or five "distinct movements" or "adjustments" near his waistband during the 30 or 40 seconds before they told him to step out the sedan. In Officer Zimmerman's opinion, those movements "were not . . . solely nervous movements[.]" Officer Zimmerman testified that, "[f]rom what [he] observed," he "believed that [Thornton] was concealing some sort of weapon . . . in his waistband[.]"

According to both officers, Thornton was not "free to leave" by the time they told him to step out of his car. Officer Zimmerman testified that he himself opened the door of the sedan and allowed Thornton to stand up. Officer Zimmerman did not recall seeing that Thornton needed to unbuckle his seatbelt when he stood up.

Officer Zimmerman told Thornton to place his hands on his head. Thornton complied. Officer Zimmerman claimed that, at that time, he had not yet made any physical contact with Thornton.

Officer Zimmerman started to pat down Thornton's clothing, beginning with the front waistband area. Officer Zimmerman testified that, "as soon as [he] began" to "touch [Thornton] to begin the pat down," Thornton started to run away. Officer Zimmerman said that he did not feel a weapon as he made contact with Thornton.

Officer Zimmerman claimed that Thornton "kind of pushed" him "aside a little bit and then ran, trying to run southbound in the block[.]" Thornton "slipped or fell," and Officer Zimmerman was "able to jump on top of" him while he was face-down with his

8

hands under his chest. The two officers grabbed Thornton's hands and handcuffed him. When the officers "rolled [Thornton] over," Officer Zimmerman noticed "a handgun on the ground under him."

In Officer Scott's telling of the same events, Officer Zimmerman actually "pull[ed]" Thornton out from the sedan, announced to Thornton that he was going to check him for weapons, and "went down in the [waist] area" to start the pat-down. Then, according to Officer Scott, Thornton "tried to push [Officer Zimmerman] out of the way so he could try to run." Officer Scott said that, as Thornton "pushed away," Officer Zimmerman "was able to grab" him, while he "was trying to still move his feet[.]" Officer Scott said that Thornton "slipped" on some "dead branches" on the ground, which allowed them to regain control of him. According to Officer Scott, "once [they] got him in handcuffs, [they] picked him up, and the handgun was right there underneath of him."

Thornton elected not to testify, and defense counsel argued the motion based on the testimony of the two officers. Defense counsel conceded that the officers had the right to investigate Thornton's improperly parked sedan, but challenged whether their observations justified the pat-down. Defense counsel asserted that, "[a]t worst," the officers may have observed "some kind of movements that in their mind are a characteristic of an armed person[.]" Defense counsel argued that "in fact, if they saw enough to really think that [Thornton] had a gun, they wouldn't have been wasting their time even talking to him about permission to search the car, much less go for the K-9 unit." Defense counsel theorized that the officers were "looking for drugs" when they decided to search Thornton's person after he refused to consent to a vehicle search.

9

As the sole justification for the pat-down, the State pointed to the officers' testimony that Thornton was "reaching into his waistband," considered in light of the officers' testimony about their training and experience in the identification of armed persons. The State also argued that "there really was no search" because the discovery of the gun occurred after what the State called Thornton's "unprovoked flight" as soon as the pat-down started. In response to that second argument, defense counsel asserted that the handgun should be suppressed as "the fruit of the poisonous tree."

After several hours of consideration, the court rendered a thoughtful and cautious oral ruling. The court noted: "Despite what appears on its face to be simple facts, the legal analysis is actually fairly complicated." While admitting that the case presented "a close question," the court announced that it would deny the motion to suppress.

The court, proceeding in chronological order, first determined that the officers had acted lawfully when they initially confronted Thornton. The court recognized that there was "some merit" to the suggestion that the officers were using the parking violation as "an excuse to inquire further into the driver who was sitting in the vehicle." Yet the court concluded that there was in fact "a real issue with an illegally parked car" to justify the initial investigation.

The court then examined the officers' "somewhat conflicting stories" about what happened after they approached Thornton's sedan. The court noted that Officer Scott provided "very few details" about observations that made him suspect that Thornton was armed. The court reasoned that Officer Scott's efforts to search the sedan were "somewhat inconsistent with his genuine belief that there might be a weapon involved."

10

The court concluded: "His testimony frankly was unconvincing." The court said that, if the State had offered only Officer Scott's testimony, the decision would be "relatively easy," because the court would conclude that "his testimony does not convince nor does it establish sufficient cause for a search."

By contrast, the court said that Officer Zimmerman's testimony was "substantially different," in that it included "much greater detail" as to "the specific motions" that suggested "that [Thornton] was possibly armed[.]" Specifically, the court mentioned the initial movement toward the waistband that Officer Zimmerman claimed to have seen as the officers were approaching the sedan. The court, "for purposes of the record," recounted that Officer Zimmerman "dipped a shoulder, straightened up, reaching for the belt area" in his in-court demonstration. The court said that this movement "if it took place as described, could be consistent with adjusting the position of a gun in the waistband or in some other actions toward the band."

Nevertheless, citing *In re Jeremy P.*, 197 Md. App. 1 (2011), the circuit court observed that "a security check by itself" typically "is not enough to establish either reasonable cause or probable cause because it could represent any variety of behaviors other than checking on a gun." The court noted the absence of any additional circumstances that might indicate dangerousness or criminality on Thornton's part. Summarizing the evidence, the court concluded: "All they have is this conduct with his hands while he's being approached by the police officers."

Although the court concluded that the officers were entitled to direct Thornton to exit the car, the court declined to conclude that the officers had sufficient justification to

11

pat down his clothing. In the court's words, the officers had "very questionable reasonably articulable suspicion" that Thornton was armed and dangerous when he stepped out of the car. The court said that, "had they done a frisk of him at this point," there would be a "serious question as to the legality of the frisk." Later, the court reiterated its opinion that "the initial search might in fact very well have been improper."

Nevertheless, the court said that "the search had not really begun as of the time when [Thornton] turned and ran" from Officer Zimmerman. Recounting the evidence, the court stated: "he begins to run, he is chased, it's not clear how far, he falls to the ground, he gets up[,] and the gun is found on the ground." The court reasoned that Thornton's flight "changes in some significant ways the analysis" because flight from the police may contribute to suspicion of criminal activity. The court also commented that it was "an interesting question" whether "a search t[ook] place or a seizure t[ook] place at all" under the circumstances, because the gun "f[ell] out from [Thornton's] waist[.]"

Finally, the court considered "whether, even if the search beg[an], improperly or illegally," there was "a subsequent event that attenuates the initial illegality." The court examined three "attenuation" factors: (1) "the time that has elapsed between the illegality and the acquisition of the evidence"; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." *See Myers v. State*, 395 Md. 261, 285-86 (2006) (discussing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

Addressing the first factor, the court observed that the time lapse was "very small, very short[.]" Addressing the third factor, the court stated that the officers' conduct was "arguably illegal" when they attempted to frisk Thornton "under circumstances in which

12

the only indicator of potential criminal conduct was the furtive motions of his hands which they felt might have indicated the presence of a gun." The court considered the second factor to be the decisive one, explaining:

> [T]he presence of the intervening circumstances, i.e., his flight[,] may have attenuated whatever problems there may have been in the initial attempt to do a Terry[5] search. So in this case, what we have is an attempt to search, that is not completed. The discovery of the gun absent a search, but following what might have been an illegal search under the Terry doctrine. It's a close question. . . . I've gone through all these cases and I've thought about this a great deal, and despite the fact as I said, I thought that in particular Officer Scott's testimony was not convincing, but nevertheless, I feel that under the circumstances and as described, I have to deny the motion.

The court emphasized that its ruling entailed the resolution of "a close question" of "whether th[e] initial attempted" frisk "might make . . . what follows . . . the fruit of the poisonous tree." The court suggested that, if Thornton wished to enter a plea, he should do so in a way to preserve his right to seek appellate review of the suppression ruling.

Thereafter, Thornton entered a plea of not guilty and submitted the case for trial on an agreed statement of facts. The court found Thornton guilty of possession of a regulated firearm after a previous conviction for a crime of violence. The court did not decide Thornton's guilt or innocence as to the other counts.

Thornton filed a timely notice of appeal.[6] At Thornton's request, this Court stayed

---

[5] *Terry v. Ohio*, 392 U.S. 1 (1968).

[6] Thornton filed a notice of appeal on his own behalf. The clerk's office received his notice on September 12, 2016, but for unknown reasons the clerk made no corresponding docket entry. An attorney filed a second notice of appeal on Thornton's

his appeal temporarily, until the Court of Appeals decided *Sizer v. State*, 456 Md. 350 (2017), another case involving the attenuation doctrine.

**DISCUSSION**

In this appeal, Thornton raises the single question of whether the circuit court erred in denying his motion to suppress evidence. Within that challenge, there are three main areas of dispute: (1) whether the discovery of the handgun occurred before or after an event implicating Thornton's constitutional rights; (2) whether the pat-down was justified at its inception by reasonable suspicion that Thornton was armed and dangerous; and (3) if the officers lacked adequate justification for the pat-down, whether the evidence discovered after Thornton's subsequent flight must be suppressed.

Before discussing those issues, we will begin with a general outline of the principles implicated in a pat-down of a vehicle occupant during a traffic stop.

### A. Principles Governing Pat-Down Searches During Traffic Stops

The Fourth Amendment to the United States Constitution states, in pertinent part, that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" Ordinarily, evidence obtained in violation of this right is inadmissible in a state criminal prosecution. *See,*

---

behalf more than 30 days after he was sentenced. A subsequent handwritten notation in the court file states: "Application for leave to appeal fld [sic] pro-se on a guilty plea (titled 'Notice of Appeal') was originally fld [sic] on 9-12-16." Thornton, however, had not entered a guilty plea. Because he exercised his right to appeal within 30 days after his conviction and sentence after a not-guilty plea upon an agreed statement of facts, his appeal is properly before this Court. *See, e.g.*, *Rodriguez v. State*, 221 Md. App. 26, 35 (2015). The clerk of the circuit court should correct the docket entries to reflect that Thornton filed a notice of appeal on September 12, 2016.

*e.g.*, *Bailey v. State*, 412 Md. 349, 363 (2010) (citing *Swift v. State*, 339 Md. 139, 149 (2006), *which cited Mapp v. Ohio*, 367 U.S. 643, 655-56 (1961)). This rule excludes not only evidence obtained as a direct result of an unreasonable search or seizure, but also evidence that is the indirect product of the violation. *See, e.g.*, *Grant v. State*, 449 Md. 1, 29-30 (2016) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). Yet even where evidence is discovered after a Fourth Amendment violation, it should not be excluded if it was obtained "'by means sufficiently distinguishable'" from the illegality, rather than "'by exploitation of that illegality[.]'" *Cox v. State*, 421 Md. 630, 651 (2011) (quoting *Wong Sun v. United States*, 371 U.S. at 488).

Warrantless searches and seizures are presumptively unreasonable, and that presumption is "subject only to a few specifically established and well-delineated exceptions[.]" *Grant v. State*, 449 Md. at 16-17 (citing *Katz v. United States*, 389 U.S. 347, 356-57 (1967)). Once it is established that a search or seizure occurred without a warrant, the State bears the burden of showing that the search or seizure falls within an exception to the warrant requirement. *See, e.g.*, *Bailey v. State*, 412 Md. at 366.

One such exception is the so-called stop-and-frisk exception established by *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the Supreme Court explained that a "seizure" occurs when a police officer approaches someone on the street and restrains the person's freedom to walk away, and that a "search" occurs when an officer pats down a person's clothing to find items hidden on the person. *Id.* at 16. The Court held that an officer "may conduct a brief, investigative 'stop'" of a particular person, without a warrant, as long as the officer "has a reasonable suspicion that criminal activity is afoot." *Crosby v.*

15

*State*, 408 Md. 490, 505 (2009) (citing *Terry v. Ohio*, 392 U.S. at 17).  During such a stop, if the officer has reason to suspect that the detained person is armed and dangerous, the officer may perform a protective "frisk," by patting down the person's outer clothing to discover any weapons that could be used to assault the officer.  *See, e.g.*, *Sellman v. State*, 449 Md. 526, 530 n.1 (2016).

Much like the stop of a pedestrian, "a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  An officer may stop a vehicle and detain its occupants, regardless of the officer's subjective motivations for doing so, if the officer at least has reasonable suspicion to believe that a traffic law has in fact been violated.  *See State v. Williams*, 401 Md. 676, 685-91 (2007) (analyzing *Whren v. United States*, 517 U.S. 806 (1996)).  This Court has held that a detention for a "parking violation[,]" such as Thornton's evident violation of TA § 21-1004(a), is "at least the functional equivalent to the stop of a moving vehicle in violation of the motor vehicle laws." *Herring v. State*, 198 Md. App. 60, 76 (2011).  The Fourth Amendment analysis is essentially the same whether the officer stops a car that is in motion or whether the officer detains the occupant of a car that is already parked.  *See Pyon v. State*, 222 Md. App. 412, 436 (2015).

Thornton has not disputed the court's finding that he was seated in the driver's seat of "an illegally parked car" or the court's conclusion that this parking violation justified a brief detention.  Moreover, because the officers had lawfully detained him, they were entitled as a matter of course to order Thornton to exit the car.  *See Maryland*

16

*v. Wilson*, 519 U.S. 408, 410 (1997) (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977)

(per curiam)).

Nevertheless, the lawful stop of a vehicle for the purpose of issuing a citation does

not itself justify a frisk of an occupant. *See Simpler v. State*, 318 Md. 311, 320-21

(1990). "To justify a patdown of the driver or a passenger during a traffic stop, . . . just

as in the case of a pedestrian reasonably suspected of criminal activity, the police must

harbor reasonable suspicion that the person subjected to the frisk is armed and

dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

In determining whether an officer has sufficient reason to suspect that a person is

armed and dangerous, "due weight must be given, not to [the officer's] inchoate and

unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which [the

officer] is entitled to draw from the facts in light of [the officer's] experience." *Terry v.*

*Ohio*, 392 U.S. at 27. The Court of Appeals has described the standard as follows:

> When reviewing whether reasonable suspicion exists, the test is the
> totality of the circumstances, viewed through the eyes of a reasonable,
> prudent, police officer. The test is objective: the validity of the stop or the
> frisk is not determined by the subjective or articulated reasons of the
> officer; rather, the validity of the stop or frisk is determined by whether the
> record discloses articulable objective facts to support the stop or frisk.
> Reasonable suspicion requires an officer to have specific and articulable
> facts which, taken together with rational inferences from those facts,
> reasonably warrant that intrusion. In other words, the officer has reason to
> believe that an individual is armed and dangerous if a reasonably prudent
> person, under the circumstances, would have felt that he was in danger,
> based on reasonable inferences from particularized facts in light of the
> officer's experience.

*Sellman v. State*, 449 Md. at 542-43 (citations, quotation marks, and brackets removed).

In this appeal, Thornton contends that the officers lacked reasonable suspicion to

believe that he was armed and dangerous and, therefore, that Officer Zimmerman performed an unreasonable search when he touched Thornton's waistband. He contends that the evidence of the discovery of the handgun should have been suppressed as the product of an unreasonable search. He argues that the circuit court was correct in declining to conclude that the pat-down was justified, but that the court erred in concluding that his flight from the officers attenuated the connection between the pat-down and the discovery of the handgun.

### B. The Seizure, Search, and Subsequent Seizure of Thornton

Although the State contests each of Thornton's points, it opens its brief with an argument that, as a threshold matter, "the Fourth Amendment does not" even "apply" to this case. Under the State's theory, "there was no Fourth Amendment triggering event until after Thornton ran and fell, exposing the handgun." This argument is based entirely on the Supreme Court's opinion in *California v. Hodari D.*, 499 U.S. 621 (1991).

In *Hodari D.*, a juvenile tossed aside a rock of crack cocaine as he was running away from police officers, but before an officer tackled and handcuffed him. *Id.* at 622-23. The "only issue" presented to the Supreme Court was "whether, at the time he dropped the drugs, Hodari had been 'seized' within the meaning of the Fourth Amendment." *Id.* Justice Scalia, writing for the majority, reasoned that "an arrest, . . . the quintessential 'seizure of the person'" (*id.* at 624) under the Fourth Amendment, "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *Id.* at 626 (emphasis in original). The Court concluded that Hodari "was not seized until he was tackled" by the officer, so the "cocaine abandoned while he was

18

running was . . . not the fruit of a seizure[.]" *Id.* at 629.

Because *Hodari D.* addresses a "narrow question" (*id.* at 626) about exactly when a person is seized within the meaning of the Fourth Amendment, the opinion at most informs our analysis of when Thornton himself was seized. Without question, the Fourth Amendment was implicated here well before the officers discovered the handgun. The officers displayed authority by pulling directly behind his car, activating emergency lights, approaching his car on both sides with the word "POLICE" displayed prominently on their vests, questioning him for a minute, suggesting that he would be required to wait for a K-9 unit, ordering him to exit his car, and ordering him to put his hands on his head. No reasonable person would conclude that Thornton was "free to leave" under those circumstances. *See, e.g.*, *Swift v. State*, 393 Md. at 156. While Thornton was submitting to the officers' assertions of authority, he was seized within the meaning of the Fourth Amendment, regardless of whether Officer Zimmerman touched him.

As part of its reasoning in *Hodari D.*, the Supreme Court also stated that an arrest through the application of force can occur "whether or not it succeed[s] in subduing the arrestee[.]" *California v. Hodari D.*, 499 U.S. at 624. Officer Scott described a similar seizure when he testified that he saw Officer Zimmerman "grab" Thornton while Thornton was trying to "move his feet," before Thornton managed to run away. In dicta, the Court in *Hodari D.* discussed a suspect's escape from an officer's grasp:

> To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity. If, for example, [the officer] had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine,

19

> it would hardly be realistic to say that that disclosure had been made during the course of an arrest.

*California v. Hodari D.*, 499 U.S. at 625 (emphases in original).

Emphasizing that passage, the State argues that Thornton was no longer seized for the brief moment (of unknown duration) during which he ran some short distance (of unknown length). Soon afterwards, the officers physically restrained Thornton by getting on top of him, grabbing his arms, placing him in handcuffs, and either rolling him over or lifting him off the ground. Only after they moved him did they discover the handgun underneath where he had fallen. The State theorizes that forcibly moving a suspect from the ground to reveal an object beneath the suspect is "doctrinally equivalent" to observing a suspect voluntarily discard an object while fleeing.

Even if we agreed with that premise, it would fail to address the central issue of Thornton's challenge. Thornton is not even challenging the legality of the seizure or seizures of his person. Rather, Thornton contends that Officer Zimmerman conducted an unreasonable search of his person, leading to the discovery of the handgun.

The State has expressly conceded that Officer Zimmerman made physical contact with Thornton by touching his waistband to initiate a pat-down. It is beyond dispute that the purpose of this contact was to frisk Thornton for weapons, not to restrain his movement. Such a frisk is a "search" subject to the Fourth Amendment's reasonableness requirement. *See Terry v. Ohio*, 392 U.S. at 16 ("it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a

20

'search'"). A frisk is unreasonable unless it is "justified at its inception[.]" *Id.* at 20.

Hence, "'[b]efore an officer places a hand on the person of a citizen in search of anything, [the officer] must have constitutionally adequate, reasonable grounds for doing so[.]'" *Sellman v. State*, 449 Md. at 558 (quoting *United States v. Powell*, 666 F.3d 180, 185 (4th Cir. 2011)) (further quotation marks omitted).[7]

It is true that Officer Zimmerman did not feel the handgun during the momentary pat-down and that the officers noticed it only after Thornton's flight and the physical seizure of his person. The exclusionary rule, however, bars the use of "both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'" *Utah v. Strieff*, 579 U.S. ___, ___, 136 S. Ct. 2056, 2061 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)) (further quotation marks omitted). The circuit court's ruling here turned on whether evidence of the discovery of the handgun needed to be suppressed where the discovery occurred "absent a search, but following on what might have been an illegal search under the Terry doctrine[.]" In other words, as the court explained, the pivotal question was whether an initial unlawful pat-down "might make . . . what follows on it . . . the fruit of the poisonous tree." The court addressed that

---

[7] Arguably, a search had begun even before Officer Zimmerman touched Thornton's waistband. Just as a "seizure can occur without any physical contact," "an officer can initiate a frisk before physically touching a person" if, under all of the circumstances, "a reasonable person would have believed that the search was being initiated." *Doornbos v. City of Chicago*, 868 F.3d 572, 581 (7th Cir. 2017) (holding that a reasonable person could conclude that a search occurred where officer displayed authority and reached out to conduct frisk, but in response the person pushed the officer and tried to run away).

21

question through the attenuation doctrine, one of the exceptions to the general rule excluding evidence derived from a Fourth Amendment violation. *See, e.g.*, *Utah v. Strieff*, 136 S. Ct. at 2061.[8]

At most, *Hodari D.* negates something that was not even a component of Thornton's challenge. Thornton has not contended that he was continuously seized during the period in which he ran from the officers, nor was he required to make such a showing. To prevail on the suppression motion, he only needed to establish "'two propositions'": (1) the "'primary illegality'" of an unreasonable search; and (2) "'the cause and effect relationship between the primary illegality and the evidence in issue[.]'" *Cox v. State*, 421 Md. at 651-52 (quoting *Gibson v. State*, 138 Md. App. 399, 404 (2001)). The circuit court here reasoned that, even if Thornton could establish the first proposition, he could not establish the second.

C.      **Existence or Nonexistence of Reasonable Suspicion for the Pat-Down**

Thornton and the State present competing arguments about whether the pat-down was justified by reasonable suspicion that Thornton was armed and dangerous. At a more basic level, the parties also disagree about *how* this Court should analyze that issue.

As both parties acknowledge, the ordinary standard of review for a suppression ruling is well established. The review of the ruling is based on information from the record of the suppression hearing. *See, e.g.*, *Sizer v. State*, 456 Md. 350, 362 (2017).

_____

[8] In addition, evidence should not be excluded if the evidence was derived from an independent source or if it was inevitable that the police would have discovered the evidence. *See, e.g.*, *Utah v. Strieff*, 136 S. Ct. at 2061.

22

Suppression rulings present a mixed question of law and fact. *Swift v. State*, 393 Md. at 154. Because the "trial court is in the best position to resolve questions of fact and to evaluate the credibility of witnesses[,]" the appellate court defers to the trial court's factual findings unless those findings are clearly erroneous. *Id.* at 154-55 (citing *State v. Green*, 375 Md. 595, 607 (2003)). Under this standard, the appellate court views "the trial court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the party who prevails on the issue that the defendant raises in the motion to suppress." *Hailes v. State*, 442 Md. 488, 499 (2015) (citing *Raynor v. State*, 440 Md. 71, 81 (2014)) (quotation marks and brackets removed). By contrast, the appellate court reviews "without deference the trial court's application of the law to its findings of fact." *Id.* "'[W]here, as here, a party has raised a constitutional challenge to a search[,]" the appellate court makes "an independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case.'" *Grant v. State*, 449 Md. at 14-15 (quoting *State v. Wallace*, 372 Md. 137, 144 (2002)).

The usual two-step approach is difficult to follow here, because the circuit court was reluctant to make express factual findings or legal conclusions on the issue of reasonable suspicion. The transcript makes it clear that the court was, at the very least, not fully convinced about whether the officers had reasonable suspicion to justify the pat-down. The court was only confident enough to decide that, under the attenuation doctrine, the evidence should not be excluded even if the officers lacked reasonable suspicion. The court discussed the issue of reasonable suspicion in hypothetical terms,

23

implying that it might have doubts about what the officers actually observed, in addition to doubts about the legal significance of any such observations. Most notably, the court spoke about the significance of Thornton's conduct "if it took place as described" by Officer Zimmerman, which is not quite the same as a finding that the conduct actually took place as described.

In their opening briefs, both parties argue that this Court should decide the issue of reasonable suspicion in their favor, based on the existing record. Thornton asserts that the circuit court concluded, or at least strongly suggested, that the officers lacked reasonable suspicion to conduct the pat-down, and he argues that the court was correct in doing so. The State admits that the court "was struggling" to decide whether the officers had reasonable suspicion, but it asserts that the court's ruling was "crafted in such a manner that it did not address" that issue.

Despite the State's assertion that "the judge never reached the issue," the State goes on to argue that, to the extent this Court considers the issue, this Court should view the facts in the light most favorable to the State as the party that prevailed on the motion. In reply, Thornton asserts that, even though the court did not explicitly say so, "the entirety" of the ruling "leaves little doubt that the court would have granted the motion to suppress if the only issue had been whether or not there was reasonable suspicion supporting the frisk." Consequently, Thornton contends that "the evidence regarding *that sub-issue* should be viewed in the light most favorable" to him. (Emphasis in original.) He argues that it would "not make logical sense" to review all findings in the light most favorable to the State where the State did not prevail on all issues.

24

Generally, where "'there is no factual statement or conclusion, there is no reason for the appellate court to examine the record with an evidentiary slant in favor of the [prevailing party] in order to sustain a non-existent presumption.'" *Grant v. State*, 449 Md. at 33 (quoting *Goodwin v. Lumbermens Mut. Cas. Co.*, 199 Md. 121, 129-30 (1952)). Where "one party prevails on one issue that the defendant raises in the motion to suppress, but does not prevail on the motion to suppress, the appellate court views the trial court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the party that prevailed on the issue insofar as the appellate court considers the issue." *Hailes v. State*, 442 Md. at 499 n.5.

Here, the State in no sense prevailed in persuading the court that the officers had reasonable suspicion to justify the frisk. Although the court did not expressly rule in Thornton's favor, the court had acknowledged earlier in the hearing that the State bore the burden of overcoming the presumptive unreasonableness of a warrantless search. Thus, Thornton would have been entitled to prevail on that issue even if the evidence were inconclusive. *See Grant v. State*, 449 Md. at 28-29 (citing *Epps v. State*, 193 Md. App. 687, 704 (2010)). It would be inappropriate to view the facts in the light most favorable to the State regarding an issue on which the court could not say that the State had carried its burden.

The State's account of the facts preceding the pat-down is noticeably more favorable to the State than is the version described by the circuit court. For example, throughout its brief, the State repeatedly asserts that the court "credited" Officer Zimmerman's testimony. But while it is apparent that the court accepted certain portions

25

of Officer Zimmerman's testimony, the court made no comment about his overall credibility. *Cf. Sizer v. State*, 456 Md. at 361 (noting that the hearing judge expressly stated that she found the "testifying officers 'to be truthful and credible' and that they had 'testified . . . without embellishment[]'"). The State insists that there is "no reason in the record" to doubt Officer Zimmerman's testimony, but the State fails to mention that the circuit court asked probing questions to the prosecutor specifically about "the credibility of the assertion that *they* saw actions consistent with someone being armed[.]" (Emphasis added.) It would be a mistake to interpret the court's statement, that Officer Zimmerman's testimony was "substantially different" from the "unconvincing" testimony of his partner, as a blanket endorsement of everything said by Officer Zimmerman. Considered in context, the court was contrasting the level of specificity in the officers' testimony, not making some sort of binary credibility assessment.[9]

The State, treating Officer Zimmerman's testimony as an established fact, asserts that Officer Zimmerman saw Thornton make multiple adjustments to his waistband while the officers were questioning him. Yet in its ruling the circuit court mentioned only the initial movement that Officer Zimmerman said that he observed while the officers were first approaching. The court made a point to describe for the record Officer

---

[9] The court emphasized that Officer Scott "g[ave] very few details" about the observations that aroused his suspicion. The court went on to say: "[Officer Scott's] testimony frankly was unconvincing. But . . . Officer Zimmerman's testimony is substantially different. There was much greater detail as to what the specific motions were that constituted proof or suggestion that [Thornton] was possibly armed[.]" Later, the court reiterated that, while Officer Scott's testimony "does not convince nor does it establish sufficient cause for a search or anything else, Officer Zimmerman's testimony is more specific and the like."

26

Zimmerman's demonstration of that movement. By contrast, the court said nothing about the additional "checks" or "adjustments" that the officers claimed to observe while they were questioning Thornton. The court concluded, "[a]ll they ha[d]" to generate suspicion was "this conduct with his hands while he's being approached by the police officers. Any such conduct, the court said, "could be consistent with adjusting the position of a gun in the waistband or in some other actions toward the band."

As Thornton points out, Maryland cases have held that an officer's observation of some feature that could be consistent with the possession of a concealed weapon, standing alone, ordinarily is not enough to justify a stop and frisk. In *Ransome v. State*, 373 Md. 99 (2003), the Court of Appeals concluded that an officer "did not have a reasonable basis for frisking" (*id.* at 111) a man who "had done nothing to attract police attention other than being on the street with a bulge in his pocket at the same time [the officer] drove by." *Id.* at 109-10. The Court acknowledged that "a noticeable bulge in a man's waist area may well reasonably indicate that a man is armed" (*id.* at 107), but the Court also noted that men often "carry innocent personal objects in their pants pockets" that "will create some sort of bulge." *Id.* at 108. The Court concluded, generally, that an officer's observation of a bulge in a man's clothing may justify a frisk in "combination" with other "circumstances justifying a reasonable belief that the bulge noticed by the officer may be a weapon or that criminal activity may be afoot[.]" *Id.* at 109.

In addition to citing *Ransome*, Thornton focuses his argument on *In re Jeremy P.*, 197 Md. App. 1 (2011), a case involving officer testimony about waistband adjustments. In that case, a detective stopped Jeremy P., a juvenile, after the detective observed him,

27

while walking on the street with a friend, make "maybe two or three" movements that the detective characterized as "indicative of somebody constantly carrying a weapon on them." *Id.* at 5. The detective gave a series of vague descriptions of the movements: that Jeremy P. "kept playing around with his waistband area"; that he "kept making firm movements in his waistband area"; and that he was "adjusting hi[m]self from the front area" by "fixing" his shirt. *Id.* at 4. The detective asserted that the front waistband area is a "high risk area" for possible weapons. *Id.* at 4, 5.

In light of *Ransome*, this Court reasoned that, "just as a bulge may be created by a wide variety of objects other than a weapon, so, too, can a person touching the area of his waistband be indicative of a wide variety of causes other than adjusting a concealed weapon." *Id.* at 13. The Court noted that, "[a]lthough there can be no bright-line rule given the individualized nature" of each case, the cases generally hold that "a police officer's observation of a suspect making an adjustment in the vicinity of his waistband does not give rise to reasonable suspicion sufficient to justify a *Terry* stop." *Id.* at 14. "Typically, to provide the reasonable and articulable suspicion necessary to warrant an investigative detention in the absence of other suspicious behavior indicating the possibility of criminal activity, the officer must be able to recount specific facts, *in addition to the waistband adjustment*, that suggest [that] the suspect is concealing a weapon in that location, such as a distinctive bulge consistent in appearance with the presence of a gun." *Id.* (emphasis added).[10]

---

[10] *Jeremy P.* addresses the legality of an initial stop, but does not address the legality of a subsequent frisk. Nevertheless, its analysis is salient here because carrying a

On the record before it, the *Jeremy P.* Court concluded that the detective's testimony lacked sufficient "descriptive details about the specific movements he observed" and lacked sufficient articulation of "why [the detective] considered [Jeremy P.]'s movements to be indicative of a concealed weapon." *Id.* at 20. Thornton argues that Officer Zimmerman's testimony was similarly deficient. As in *Jeremy P.*, there was no testimony here, "[a]part from th[e] waistband adjustments," to suggest that Thornton was "behaving in [a] suspicious manner." *Id.* Officer Zimmerman "did not testify that he observed a bulge consistent with the presence of a weapon[,]" nor did he "ascribe an apparent weight or size that might have indicated a gun." *Id.* at 20-21.

In response, the State contends that Officer Zimmerman provided "precisely the sort of testimony that was missing" in the *Jeremy P.* case. The State notes that the detective in *Jeremy P.* mentioned only general experience with "gang-related" crime (*In re Jeremy P.*, 197 Md. App. at 4, 21), while Officer Zimmerman specifically mentioned his training and experience in identifying armed persons. The State asserts that Officer Zimmerman rationally explained how Thornton's movements were consistent with those of a person trying to "conceal something" in the person's front waistband. The State points out that, unlike in *Jeremy P.*, Officer Zimmerman testified that he saw Thornton reach toward his waistband while Thornton was watching the officers approach him. The State argues that "the circumstances permitted the reasonable inference [that] Thornton

---

concealed weapon was the only criminal activity that the detective suspected that Jeremy P. was committing. *Cf. Russell v. State*, 138 Md. App. 638, 651 (2011) (analyzing the legality of a stop and frisk together where "the suspected criminal activity *was* that [the defendant] was unlawfully carrying a handgun") (emphasis in original).

29

was actively concealing something in his waistband." In the State's view, such an inference would help to dispel the likelihood that the object was "merely a cell phone or another innocent object." *In re Jeremy P.*, 197 Md. App. at 20.

The State insists that the present case is more analogous to *Matoumba v. State*, 162 Md. App. 39 (2005), *aff'd*, 390 Md. 544 (2006), in which this Court concluded that an officer had reasonable suspicion to frisk the passenger of a vehicle during a traffic stop.[11] There, the officer testified that the passenger "repeatedly looked back at the police cruiser while the officers were [e]ffecting the stop" and "appeared to dip his right shoulder down to the floor as [the officer] approached[.]" *Id.* at 43. Yet in that case, the passenger also "placed his right hand *behind his back* as [the officer] actually reached" the vehicle (*id.* (emphasis added)), which this Court characterized as an "obvious attempt to conceal some item *behind his back*[.]" *Id.* at 50 (emphasis added). The passenger then "maintained constant eye contact" with the officer and "demonstrated visibly shaking hands when commanded to show them." *Id.* at 43. The Court's determination of reasonable suspicion gave "due weight" to this "nervous conduct" (*id.* at 50) in combination with what it described as the "'evasive action.'" *Id.* at 48.

*Matoumba* is one of several Maryland cases to conclude that furtive hand movements, in combination with other factors, can contribute to reasonable suspicion that the occupant of a vehicle is armed and dangerous. *See Chase v. State*, 449 Md. 283, 307-

---

[11] The Court of Appeals affirmed the judgment without reaching the issue of reasonable suspicion. The Court had granted certiorari only to address whether a police officer was required to be qualified as an expert when testifying at a suppression hearing. *Matoumba v. State*, 390 Md. at 546.

08 (2016) (upon stopping vehicle for suspected illegal drug activity, officers observed driver and passenger reach under seat as officers were approaching); *Goodwin v. State*, 235 Md. App. 263, 281-83 (2017) (officers observed passenger engage in suspected illegal drug activity, driver did not stop immediately when officers signaled for him to stop, and driver bent toward floor area of car out officers' view), *cert. denied*, 457 Md. 671 (2018); *Underwood v. State*, 219 Md. App. 565, 569-75 (2014) (driver had bulging pockets, driver showed extraordinarily stiff demeanor during traffic stop, officer knew that driver was on probation for prior handgun offense, and driver moved hand towards his pocket as officer reached for hand); *Russell v. State*, 138 Md. App. 638, 653-54 (2001) (during traffic stop in area in which guns are frequently recovered, passenger appeared extremely nervous when asked for his license and then attempted to conceal something in a pocket large enough to hold a handgun).

As these cases illustrate, a "factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer." *Ransome v. State*, 373 Md. at 105. Still the State cites no case, in Maryland or elsewhere, holding that testimony about a movement by the occupant of a vehicle while an officer is approaching is enough to generate reasonable suspicion that the occupant is armed and dangerous. This Court would need to venture beyond our existing precedent to conclude that Officer Zimmerman's testimony established justification for the frisk, where essentially all other objective circumstances indicated that Thornton was peaceful, compliant, and law-abiding, save for a minor parking infraction.

31

In sum, our review of the controlling case law leads us to the same impasse reached by the circuit court. We agree with the court's observation that, although Officer Scott's testimony was comparable to that of the detective in *Jeremy P.*, Officer Zimmerman's testimony was relatively more specific and objective. We further agree that it was still "very questionable" whether those marginal improvements were enough to establish reasonable suspicion. The task of resolving that issue for the first time at the appellate level is further complicated by the standard of review, which requires deference to the circuit court's fact-finding and inferences favorable to the party that prevails on an issue in the circuit court. As explained above, it is unclear whether Thornton truly prevailed on the issue and, if so, whether he may have prevailed on factual grounds as well as legal grounds.

In his reply brief, Thornton suggests that, if this Court concludes "that the circuit court's ruling as to reasonable suspicion is overly ambiguous," then this Court should remand the case so that the circuit court may clarify its ruling. *See generally* Md. Rule 8-604(d)(1) (authorizing appellate court to remand case for further proceedings if "the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment," or if "justice will be served by permitting further proceedings"); *Wilkerson v. State*, 420 Md. 573, 597-99 (2011) (ordering limited remand for circuit court to conduct supplemental hearing and for court to make "appropriate findings" about issue on which court had made no ruling). It is possible that such a remand might help this Court determine exactly what findings and conclusions the circuit court actually made on the issue of reasonable suspicion. *See Wilkerson v. State*, 420 Md. at 597 ("as is often the

32

case, appellate courts need trial courts to explicate, to some degree, just what they are deciding or finding so that we may perform our tasks").

Ultimately, however, a remand is unnecessary. We shall assume, as the circuit court apparently did, that the officers lacked objectively reasonable suspicion to conduct the pat-down. The circuit court proceeded to deny the motion anyway, based on the attenuation doctrine. The existing record is sufficient for this Court to review that conclusion. As explained below, we shall uphold the suppression ruling solely on that ground. Consequently, we need not decide whether the pat-down was reasonable. *See Cox v. State*, 397 Md. 200, 209-10 (2007) (declining to address issue of whether police conduct was reasonable and instead holding that, under the attenuation doctrine, the evidence should not be suppressed even if officers lacked probable cause or reasonable suspicion); *Myers v. State*, 395 Md. 261, 277-78 (2006) (same).

D.      **Relationship Between Primary Illegality and Discovery of Evidence**

Thornton contends that the circuit court erred in concluding that his act of fleeing from the officers attenuated the connection between any unlawful police conduct and the discovery of the handgun. Because the State prevailed on that issue in the circuit court, we consider the record regarding that issue in the light most favorable to the State. *See Hailes v. State*, 442 Md. at 499. Although we owe deference to the circuit court's factual findings, we conduct a non-deferential review of "legal conclusions, the application of the law to the facts, and the determination of whether the evidence should be suppressed[.]" *Myers v. State*, 395 Md. at 274; *see Cox v. State*, 397 Md. at 211 (reasoning that the ultimate issue of attenuation involves a question of law that is subject

to de novo appellate review).

The Supreme Court has long recognized that even evidence that "would not have come to light but for the illegal actions of the police" (*Wong Sun v. United States*, 371 U.S. at 488) should not be excluded if "the connection between the lawless conduct of the police and the discovery of the challenged evidence ha[s] 'become so attenuated as to dissipate the taint.'" *Id.* at 487 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). This so-called attenuation doctrine "evaluates the causal link between the government's unlawful act and the discovery of the evidence[.]" *Utah v. Strieff*, 136 S. Ct. at 2061. Evidence should not be suppressed if "the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

The attenuation doctrine entails "a fact-specific analysis that focuses on when and the manner in which" evidence was obtained "in relation to the unlawful conduct." *Sizer v. State*, 456 Md. at 376. The Supreme Court has identified three factors to guide this analysis: (1) "the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence"; (2) "'the presence of intervening circumstances'" between the misconduct and the discovery of evidence; and (3) "'the purpose and flagrancy of the official misconduct.'" *Utah v. Strieff*, 136 S. Ct. at 2062 (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). This analysis "involves a balancing test, and 'no single factor is dispositive on the issue of attenuation.'" *Cox v. State*, 421 Md. at 653 (quoting *Cox v.*

*State*, 397 Md. at 219).

Before addressing the issue of attenuation, the State argues in its brief that the "correct approach" should be to bypass the usual doctrinal framework and instead to make a free-standing assessment of whether "the curative benefit of exclusion outweighs its social harm" here. To the extent that the State is proposing a separate ground for affirmance, the State's argument is misguided, because the policies underlying the exclusionary rule are already embedded into the fruits-of-the-poisonous-tree doctrine and its exceptions. *See, e.g.*, *Williams v. State*, 372 Md. 386, 410 (2002) (citing *Nix v. Williams*, 467 U.S. 431, 442-44 (1984)). The three-factor attenuation analysis "'attempts to mark the point at which . . . the deterrent effect of the exclusionary rule no longer justifies its cost.'" *Myers v. State*, 395 Md. at 286 (quoting *Brown v. Illinois*, 422 U.S. at 609 (Powell, J., concurring)); *see also Gibson v. State*, 138 Md. App. at 403 ("the underlying purpose of the attenuation test is to mark 'the point of diminishing returns of the deterrence principle'") (quoting Anthony G. Amsterdam, *Search, Seizure, and Section 2255: A Comment*, 112 U. Pa. L. Rev. 378, 390 (1964)). In particular, these concepts are "embodied in the third factor" of the attenuation analysis, which "requires an examination of the flagrancy of the police misconduct in obtaining evidence" from a defendant. *Miles v. State*, 365 Md. 488, 537 (2001).

Invoking the notion of "good faith," the State argues that exclusion is improper because "Officer Zimmerman had (at least) a *subjective* belief that Thornton was armed" even if that belief was objectively unreasonable. As Thornton aptly notes in his reply brief, however, the cases refusing to exclude evidence based on a police officer's "good

35

faith" belief in the lawfulness of his or her conduct also require that the officer's belief be "objectively reasonable."[12]  The absence of bad faith is significant here only within the assessment of the third attenuation factor, which examines the purpose and flagrancy of police misconduct.  *See, e.g.*, *Utah v. Strieff*, 136 S. Ct. at 2063; *Cox v. State*, 397 Md. at 220.

### *Temporal Proximity*

The first of the three attenuation factors requires the court "'to determine how closely the discovery of evidence followed the unconstitutional search.'"  *Sizer v. State*, 456 Md. at 375 (quoting *Utah v. Strieff*, 136 S. Ct. at 2062).  The "likelihood that the taint has been purged increases in proportion to the time that has elapsed between the unlawful conduct and the evidence derived" from the unlawful conduct.  *Ferguson v. State*, 301 Md. 542, 550 (1984).

Although neither officer here was asked to make a specific estimate, all of the testimony indicates that the officers discovered the handgun a matter of seconds after they initiated the pat-down.  The interval was only long enough for them to see Thornton

---

[12] *See Davis v. United States*, 564 U.S. 229, 232 (2011) ("objectively reasonable" reliance on binding appellate precedent); *Arizona v. Evans*, 514 U.S. 1, 14-16 (1995) ("objectively reasonable" reliance on police computer record erroneously indicating existence of warrant); *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) ("objectively reasonable" reliance on statute later determined to be unconstitutional); *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984) ("objectively reasonable" reliance on warrant issued by a detached and neutral magistrate later determined to be invalid); *United States v. Leon*, 468 U.S. 897, 922 (1984) (same); *see also Heien v. North Carolina*, 574 U.S. ___, ___, 135 S. Ct. 530, 539 (2014) (explaining that the "Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable") (emphases in original).

run a short distance, to see him fall, to handcuff him, and to move him from where he fell.  The circuit court concluded that this time lapse was "very small, very short."

The State concedes that the factor of temporal proximity weighs in Thornton's favor.  Indeed, this factor weighs in a defendant's favor where "only minutes" have elapsed between an unlawful act and when the evidence is obtained.  *Utah v. Strieff*, 136 S. Ct. at 2062.  The time lapse "can hardly be less than it was here."  *Cox v. State*, 397 Md. at 218 (weighing temporal proximity factor in defendant's favor where time lapse was "merely two minutes").

Nevertheless, the Court of Appeals has said that temporal proximity is "'relatively unimportant'" among the three factors.  *Cox v. State*, 421 Md. at 654 (quoting *Ferguson v. State*, 301 Md. at 550).  Even where the discovery of evidence is "nearly contemporaneous" with the police conduct, the brief time lapse can be outweighed if the other two factors weigh in the State's favor.  *Cox v. State*, 397 Md. at 218.

### *Presence of an Intervening Circumstance*

The parties disagree over whether Thornton's flight from the officers during the pat-down is an "intervening circumstance" that might weigh in favor of attenuation.  An intervening circumstance is an event that is said to "'break[] the causal connection between the unlawful conduct and the derivative evidence.'"  *Sizer v. State*, 456 Md. at 389 (quoting *Ferguson v. State*, 301 Md. at 551).

The circuit court here cited *Myers v. State*, 395 Md. 261 (2006), when it characterized Thornton's flight as an intervening circumstance.  *Myers* establishes that the discovery of an outstanding warrant for the arrest of a detainee during an otherwise

37

illegal traffic stop is "an intervening circumstance capable of attenuating the taint of the illegal stop." *Id.* at 291. In reaching its decision, the Court of Appeals reasoned that, once an officer discovers an outstanding arrest warrant, the officer "gain[s] an independent and intervening reason to arrest" the detainee. *Id.* at 293. The lawful arrest based on the outstanding warrant, in turn, justifies a lawful search incident to that arrest. *Id.* at 293-94. The Court of Appeals has reaffirmed the rationale of *Myers* on two occasions. *Sizer v. State*, 456 Md. at 376-77; *Cox v. State*, 397 Md. at 219. Likewise, the Supreme Court has held that the discovery of an outstanding arrest warrant during an illegal stop is an intervening circumstance that "strongly favors the State[,]" because "once [an officer] discover[s] the warrant, [the officer] ha[s] an obligation to arrest" the detainee, and, once the arrest is authorized, it is "undisputedly lawful to search [the detainee] as an incident of" that arrest. *Utah v. Strieff*, 136 S. Ct. at 2062-63.

In *State v. Holt*, 206 Md. App. 539 (2012), *aff'd on other grounds*, *Holt v. State*, 435 Md. 443 (2013), this Court considered a similar issue of whether "a new crime committed by a defendant after an illegal search or seizure is a sufficient intervening circumstance that can attenuate the taint of an illegal search or seizure." *Id.* at 563. At the hearing on Holt's suppression motion, detectives testified that, after they pulled over Holt's vehicle and walked up to it, Holt pulled out a handgun to point it directly at one detective and drove his vehicle towards another detective. *Id.* at 546-47.

Although this Court concluded that the stop was lawful, we went on to conclude that, "assuming [that] the stop was not supported by articulable reasonable suspicion, any new crimes committed by [the defendant] immediately following the stop, such as

38

possessing, raising and pointing the firearm at [one detective] and accelerating his vehicle towards [another detective] purged the taint of the unlawful stop[.]" *Id.* at 551. We followed a number of cases holding that an earlier Fourth Amendment violation does not require the suppression of evidence of a subsequent crime by the defendant. *Id.* at 563 & n.4 (collecting authorities). In light of these authorities, we concluded that a defendant's "new crime, even if causally linked to illegal activity on behalf of law enforcement, is an intervening circumstance that attenuates the taint from that illegality." *Id.* at 565.[13]

This Court further held that the testimony that the suspect pointed the gun at a detective was not limited to proof of the crimes associated with that act: assault and the use of a firearm in the commission of a crime of violence. *Id.* at 566. The testimony could also be used to prove the crime of being a felon in possession of a firearm, which was a "preexisting crime" revealed through his response to the police conduct. *Id.* The Court concluded that the evidence could be used to prove the crime of possession because "it was not innocent conduct which revealed [the defendant's] possession of the firearm, but instead criminal conduct[,]" and because "the officers did not discover the firearm before [the defendant's] criminal activity[.]" *Id.* at 568. In sum: "The detectives did not

_____

[13] The Court of Appeals granted certiorari to address whether "'any and all new crimes committed by a defendant'" after an unlawful search of seizure "'purge[ ] the taint of the illegal actions of the police[.]'" *Holt v. State*, 435 Md. at 457. Because the Court concluded that the stop was lawful, the Court did not reach that question in its majority opinion. *Id.* In dissent, Judge Greene, joined by Judge Harrell, criticized this Court's suggestion that *any* new crime attenuates the taint form an unlawful search or seizure, opining that the "decision of whether a subsequent crime constitutes an intervening circumstance must be determined on a case-by-case basis[.]" *Id.* at 471 (Greene, J., dissenting).

learn about the gun through [unlawful police conduct], but rather through [the defendant's] subsequent criminal actions." *Id.*

The circuit court here concluded that Thornton's act of running from the officers during the pat-down qualified as an intervening circumstance. The State argues that the circuit court was correct because Thornton's flight from the officers is "functionally similar" to the crimes committed by Holt. Thornton responds that a person's flight in response to an unlawful search or seizure does not automatically qualify as an intervening circumstance. Generally, "'a noncriminal act that merely *reveals* a crime that has been or is being committed by the time of the official misconduct'" is not treated as an intervening circumstance. *State v. Holt*, 206 Md. App. at 567 (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1983)); *accord* 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(j), at 490 (5th ed. 2012) (explaining that the "'new crime' exception is inapplicable when the defendant's response to the police illegality is not itself criminal but merely exposes an ongoing crime").

As persuasive authority, Thornton cites *United States v. Gallinger*, 227 F. Supp. 3d 1163 (D. Idaho 2017), *appeal dismissed*, 2017 WL 6945879 (9th Cir. Feb. 7, 2017), which turned on whether the defendant's flight constituted a new crime. In that case, the defendant fled on foot (*id.* at 1166) during the course of what the district court determined to be an unlawful detention. *Id.* at 1171. The defendant was charged with unlawfully possessing a handgun that the officers had recovered in the path of the defendant's flight. *Id.* at 1166. The court rejected the government's argument that a defendant's flight from an illegal seizure was, in itself, an intervening circumstance

40

capable of purging the taint of the illegal seizure. *Id.* at 1172 (citing *United States v. Brodie*, 742 F.3d 1058, 1060 (D.C. Cir. 2014); *United States v. Beck*, 602 F.2d 726 (5th Cir. 1979)). The district court explained: "Where [c]ourts have found attenuation in a defendant's flight, it has been premised on a determination that the flight was a truly independent and voluntary act by the defendant; constituted a new, distinct crime; or posed a serious risk to public safety." *United States v. Gallinger*, 227 F. Supp. 3d at 1172-73 (citing *United States v. Allen*, 619 F.3d 518, 526 (6th Cir. 2010); *United States v. Boone*, 62 F.3d 323, 324 (10th Cir. 1995); *United States v. Bailey*, 691 F.2d at 1016-18). Under the facts of that case, the court concluded that the defendant's act of running away from the illegal seizure "was not a coincidental act of his free will" and did not "constitute a new distinct crime or threat to public safety." *United States v. Gallinger*, 227 F. Supp. 3d at 1173.

Thornton asserts that, "in no way" may his own flight "be construed as" an independent and voluntary act, or as a new and distinct crime, or as a serious risk to public safety. He asserts that his "flight, in short, 'was a direct result of his *illegal detention.*'" (Emphasis added.) Yet through this attempted comparison, Thornton has unintentionally highlighted the crucial distinction: there was no "illegal detention" in this case. The officers were lawfully detaining Thornton when they initiated (what we have assumed to be) an unlawful pat-down. When Thornton took off running down the street, he was not simply avoiding an unlawful search of his person. Objectively, his conduct was also a flight from the lawful detention for a traffic violation.

Under Maryland's vehicle laws, fleeing on foot during a traffic stop can be a crime

in itself. Section 21-904(b)(2) of the Transportation Article of the Maryland Code provides: "If a police officer gives a visual or audible signal to stop and the police officer is in uniform, prominently displaying the police officer's badge or other insignia of office, a driver of a vehicle may not attempt to elude the police officer by . . . [f]leeing on foot[.]" As used in this provision, the term "'visual or audible signal' includes a signal by . . . emergency light[.]" *Id.* § 21-904(a). Lawfulness of the police conduct is not an element of this "offense of fleeing and eluding police, as the plain language of the statute[] demonstrates." *Scriber v. State*, 437 Md. 399, 412 (2014).

The officers here observed Thornton flee on foot in an apparent attempt to elude them within a minute after they had signaled for him to stop by activating the emergency lights on their vehicle and approached his car with their insignia of office prominently displayed. Those observations supplied the officers with at least probable cause to believe that Thornton was committing the offense of fleeing and eluding the officers. Thus, the officers had an objectively reasonable basis to arrest Thornton. *See* Md. Code (2002, 2008 Repl. Vol.), § 2-202(b) of the Criminal Procedure Article (authorizing a warrantless arrest if the officer has probable cause to believe that the person is committing a misdemeanor in the officer's presence or view).

Consequently, the officers acted lawfully when they physically seized Thornton after his apparent attempt to flee. That lawful arrest in response to Thornton's flight would have justified a search incident to that lawful arrest. A search was not even necessary, however, because the officers happened to discover the handgun through the seizure itself, finding it on the ground as soon as they moved Thornton from where he

42

had fallen.

The officers further testified that Thornton "pushed" Officer Zimmerman in his attempt to run away. Pushing an officer is a criminal battery even if the degree of force used is minimal. *See Hicks v. State*, 189 Md. App. 112, 125 (2009) (holding that defendant's "thrust of his elbow" at an officer attempting to frisk the defendant was an assault that justified a warrantless arrest and search); *State v. Blackman*, 94 Md. App. 284, 305 (1992) (holding that a defendant's "shove" of an officer attempting to frisk him "albeit arguably minimal, was a battery" and the commission of that crime was "all that was required to justify" an arrest of the defendant and a search incident to arrest); *see also Purnell v. State*, 375 Md. 678, 684, 696 (2003) (characterizing testimony that a defendant "pushed [an officer] into a wall and ran" as "evidence that the [defendant] assaulted [that officer] as he attempted to effect his escape"). Under Maryland law, a person ordinarily has no right to use force against an officer to resist a frisk, even if the frisk is unlawful. *State v. Holt*, 206 Md. App. at 565 (citing *Barnhard v. State*, 86 Md. App. 518 (1991), *aff'd*, 325 Md. 602 (1992); *State v. Blackman*, 94 Md. App. 284 (1992); *State v. Leatherberry*, 4 Md. App. 300, 304 (1968)).

The circuit court here focused on Thornton's flight, without saying whether it believed the testimony that Thornton actually "pushed" Officer Zimmerman. Nonetheless, the evidence supported the court's finding that Thornton fled from a lawful traffic stop. Under the circumstances, his flight evidently violated TA § 21-904(a). The apparent commission of this "new crime" may be an intervening circumstance in our attenuation analysis even though it was "causally linked" to the unlawful pat-down. *State*

43

*v. Holt*, 206 Md. App. at 565.  This case is not one in which the defendant's flight on foot from an illegal detention did not amount to a new crime.  *Cf. United States v. Gallinger*, 227 F. Supp. 3d at 1173.

In addition to his reliance on *Gallinger*, Thornton has asked this Court to follow *State v. Owens*, 992 N.E.2d 939 (Ind. Ct. App. 2013), *transfer denied*, 999 N.E.2d 417 (Ind. 2013).  In that case, an appellate court concluded that evidence that Owens possessed cocaine was tainted from the illegality of the initial stop, even though the evidence "was not actually discovered until after Owens's attempted flight from and battery of the officers[.]"  *Id.* at 942.  The court's conclusion rested on one fact: "the decision to arrest Owens was made *before* his flight, rendering discovery of the evidence all but inevitable."  *Id.* (emphasis in original).  The court reasoned: "Because the cocaine had all but been discovered before Owens's flight, his actions cannot be said to have caused its discovery in any meaningful sense."  *Id.*  The unique rationale of *Owens*, although it may have some intuitive appeal, is in serious tension with this Court's *Holt* opinion, which concluded that the commission of a new crime can be an intervening circumstance even if that crime is "causally linked to illegal activity on behalf of law enforcement[.]"  *State v. Holt*, 206 Md. App. at 565.

In reaching that conclusion, the *Holt* Court relied principally on *United States v. Bailey*, 691 F.2d 1009 (11th Cir. 1983).  In that case, DEA agents had not only *decided* to arrest and search Bailey, but the court assumed that the agents had, in fact, arrested him illegally when they began escorting him away from an airport terminal to a police precinct so that they could search him for drugs.  *Id.* at 1012.  Bailey took off running and

44

fought with the agents, before they arrested him a second time and found cocaine in an ensuing search. *Id.* The court recognized that Bailey's decision to run was not "'a mere coincidental decision' . . . unrelated to police conduct[,]" and that "'it would be sheer fiction'" to treat his decision as "'caused by anything other than the illegal stop.'" *Id.* at 1015 (quoting *United States v. Beck*, 602 F.2d at 730).

The Eleventh Circuit explained, however, that "'the question of causation'" under the attenuation doctrine "'cannot be decided on the basis of causation in the logical sense alone, but necessarily includes other elements . . . (relating to) the fundamental tenets of the exclusionary rule.'" *United States v. Bailey*, 691 F.2d at 1017 (quoting *United States v. Ceccolini*, 435 U.S. 268, 274 (1978)). The Eleventh Circuit observed that there are "strong policy reasons" to permit the police to arrest a defendant for "a new, distinct crime" committed in response to police misconduct. *United States v. Bailey*, 691 F.2d at 1017. "A contrary rule[,]" the court said, "would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Id.* Under the circumstances, Bailey had "no right to flee and to strike" the agent to resist the unlawful arrest, so his illegal resistance gave the agents probable cause to make a second arrest, thus justifying "a lawful search incident to the lawful second arrest." *Id.* at 1018-19. The evidence was admissible against Bailey even though the government dropped the charges of resisting arrest and prosecuted him for the possession crimes alone. *See id.* at 1012 n.1.

It would be a mistake to adopt a narrow focus on logical causation without considering the policy rationale articulated in the *Bailey* line of cases.

45

"[N]otwithstanding a strong causal connection in fact between lawless police conduct and a defendant's response, if the defendant's response is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime." *United States v. Bailey*, 691 F.2d at 1016-17; *accord State v. Holt*, 206 Md. App. at 564. Thornton's apparent crime of fleeing from the traffic stop and eluding the officers, even if it was "triggered by" an illegal search, was still "a sufficient intervening event to provide independent grounds for arrest." *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (following *United States v. Bailey*, 691 F.2d at 1017); *accord State v. Holt*, 206 Md. App. at 565.

We do not need to go as far as we did in *State v. Holt*, 206 Md. App. at 565, and to suggest that a defendant's commission of *any* new crime automatically attenuates the taint from an unlawful frisk. Rather, the "decision of whether a subsequent crime constitutes an intervening circumstance must be determined on a case-by-case basis[.]" *Holt v. State*, 435 Md. at 471 (Greene, J., dissenting). The decision necessarily examines both the crime itself and the context in which it was committed. *See id.* This case involves Thornton's flight from an allegedly unlawful frisk that occurred during what was an admittedly lawful stop. In these specific circumstances, where Thornton appeared to commit the new and separate offense of fleeing and eluding an officer after a lawful stop, we hold that his conduct represented an intervening circumstance.

The officers here discovered the handgun through a second, lawful seizure in response to the intervening event of Thornton's apparent commission of a new crime in their presence. This intervening circumstance weighs in favor of the State.

46

### *Flagrancy and Purposefulness of Misconduct*

The mere presence of an intervening circumstance does not itself mean that the evidence discovered after that event is admissible. The third factor, which examines the "'purpose and flagrancy'" of the police misconduct, is "'particularly' significant" among the three factors. *Utah v. Strieff*, 136 S. Ct. at 2062 (quoting *Brown v. Illinois*, 422 U.S. at 604); *see also Myers v. State*, 395 Md. at 292 (stating that this factor "forms the lynchpin of our attenuation analysis"). This factor reflects the underlying rationale of the exclusionary rule "by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Utah v. Strieff*, 136 S. Ct. at 2063. If the officers here had blatantly disregarded Thornton's rights, exclusion might be necessary to deter that kind of misconduct, regardless of subsequent events that interrupted the chain of causation. *See Holt v. State*, 435 Md. at 471 (Greene, J., dissenting) (reasoning that "[t]o ignore the third attenuation factor" by finding attenuation solely based on the commission of a new crime "would be to ignore the very purpose underlying the exclusionary rule").

Despite the importance of this factor, Thornton does little to explain his assertion that it weighs in his favor. As best as we can determine, Thornton has not suggested that the officers purposefully violated his rights, knowing that the pat-down was unlawful. The State asserts that the record reveals no reason to doubt that the officers made a good-faith effort to comply with the law. Viewing the record in the light most favorable to the State, we are inclined to agree. Indeed, when the circuit court discussed this factor, the court indicated that it did not perceive any improper motive when it said that the officers

"at least possibly" may have made "a reasonable error of law" by initiating a search that "might in fact very well have been improper." Thornton has not disputed the State's assertions that the officers acted in good faith.

Thornton nevertheless asserts that the conduct at issue, the pat-down of his waistband, "was especially egregious because any well-trained officer in Maryland would be expected to know the decisions in *Jeremy P.* and *Ransome*[.]" According to Thornton, "the flagrancy of the pat-down, which lacked reasonable suspicion, was palpable."

The suggestion that the officers here committed "flagrant" misconduct seems to conflate the violation itself with the flagrancy of that violation. An officer's conduct is not considered to be flagrant solely because the conduct is determined to violate the Fourth Amendment. *See Cox v. State*, 397 Md. at 220; *Myers v. State*, 395 Md. at 293. Where an officer acts with some colorable basis for suspicion, but is "at most negligent" in not realizing that the suspicion is not objectively reasonable, the "error[] in judgment hardly rise[s] to a purposeful or flagrant violation" of the suspect's Fourth Amendment rights. *Utah v. Strieff*, 136 S. Ct. at 2063. As the State points out, the attenuation doctrine would make little sense if it "only applied when police had an objectively reasonable articulable suspicion" to justify the police conduct.

Any conclusion that the pat-down of Thornton was unlawful in light of *Jeremy P.* and *Ransome*, even if ultimately correct, is far from obvious. Neither case declares that waistband adjustments are somehow immunized from police scrutiny. To the contrary, the *Jeremy P.* opinion recognized that "there can be no bright-line rule given the individualized nature" of cases involving waistband adjustments. *In re Jeremy P.*, 197

48

Md. App. at 14.  Likewise, the *Ransome* opinion emphasized that courts must "look at the 'totality of the circumstances' and not parse out each individual circumstance for separate consideration" in determining the existence of reasonable suspicion.  *Ransome v. State*, 373 Md. at 104.  The most important additional circumstance here is that, although Jeremy P. and Ransome were simply standing or walking on the street, the officers in this case testified that Thornton made a movement toward his waistband while he could see that he was in the presence of officers lawfully detaining him.  We agree with the circuit court that the pat-down was "arguably illegal," but not flagrantly so, where the suspicion was based on what could be characterized as "furtive motions of the hands" while the officers approached.

As explained earlier in this opinion, the determination of whether the officers had objectively reasonable suspicion that Thornton was armed and dangerous is not obvious to a court, even with the full benefit of briefing and oral argument.  Certainly, officers who are concerned for their safety do not commit flagrant misconduct if they resolve that question inaccurately within the few seconds allotted to them.  Any misconduct by the two officers here in initiating the pat-down cannot be characterized as purposeful or flagrant.  Thus, this factor weighs in favor of the State.

### *Weighing of the Three Factors*

Upon consideration of all three factors, we conclude that the presence of an intervening circumstance and the absence of flagrant or purposeful misconduct outweigh the close temporal proximity between the pat-down and the discovery of the evidence. *See Utah v. Strieff*, 136 S. Ct at 2063; *Sizer v. State*, 456 Md. at 376; *Cox v. State*, 397

49

Md. at 218. The connection between the initial pat-down and the evidence of handgun possession is sufficiently attenuated that the evidence should not be suppressed.

<u>CONCLUSION</u>

A sequence of four main events revealed Thornton's criminal possession of a handgun. First, the officers conducted a lawful traffic stop. Second, the officers initiated a pat-down, which was arguably unlawful but not flagrantly unlawful. Third, Thornton appeared to commit a new crime by running away from the officers (and possibly assaulting one of them). Finally, the officers seized Thornton and found the handgun in the process. We conclude, as the circuit court did, that the evidence of the discovery of the handgun is too attenuated from the pat-down to require the exclusion of the evidence.

In resolving the issue in this manner, we are mindful of the considerations that have led the Court of Appeals to restrict the expansion of the common-law right to resist an illegal arrest (*Rodgers v. State*, 280 Md. 406, 415-16 (1977)) and have led this Court to reject the notion that a person may resist an unlawful stop (*Barnhard v. State*, 86 Md. App. at 527-28) or frisk. *State v. Blackman*, 94 Md. App. at 306-07. In *Rodgers v. State*, 280 Md. at 418, the Court of Appeals quoted an address to the American Law Institute, in which Judge Learned Hand stated that "[t]he idea that you may resist peaceful arrest . . . because you are in debate about whether it is lawful or not, instead of going to the authorities which can determine" the answer to that debate "[is] not a blow for liberty but on the contrary, a blow for attempted anarchy." The Court added that a citizen's exercise of self-help not only endangers police officers, but often also "involve[s] passersby or other citizens, some of whom may be inclined to enter the fray, to their detriment – others

50

of whom may suffer injury merely by being in the way." *Id.* at 420. This Court has echoed those concerns. *See Barnhard v. State*, 86 Md. App. at 527-28 (reasoning that if a person had the right to resist an arguably unlawful *Terry* stop, "police officers would be subject to attack in every instance when, during the course of their investigation, they temporarily detain someone"); *see also State v. Blackman*, 94 Md. App. at 306-11.

In short, if a person is the subject of an unlawful frisk, the remedy, ordinarily, is not to take the law into his or her own hands and to flee, but to bring a civil rights action if the frisk yields no contraband or to make a motion to suppress if it does. "Close questions as to whether an officer possesses articulable suspicion must be resolved in the courtroom and not fought out on the streets." *State v. Blackman*, 94 Md. App. at 306-07. By criminalizing the conduct of fleeing and eluding police officers, the General Assembly has expressed a preference that these close questions should not be settled through a foot chase, either.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED, EXCEPT THAT THE CLERK OF THE CIRCUIT COURT FOR BALTIMORE CITY IS DIRECTED TO CORRECT THE DOCKET ENTRIES TO REFLECT THAT APPELLANT FILED NOTICE OF APPEAL ON SEPTEMBER 12, 2016. COSTS TO BE PAID BY APPELLANT.**